661 A.2d 251

STATE OF NEW JERSEY, PLAINTIFF, v. PATRICK BALL
AND BIG APPLE LEASING CO., DEFENDANTS.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. GEORGE HURTUK, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOSEPH DULANIE, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOSEPH MOCCO, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL HARVAN, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICHARD BASSI, DEFENDANT–APPELLANT.

Argued October 12, 1994—Decided July 20, 1995.

144

146

*Harold J. Ruvoldt, Jr.*, argued the cause for appellants George Hurtuk, Joseph Dulanie, and Joseph Mocco (*Ruvoldt & Ruvoldt*, attorneys; *Mr. Ruvoldt* and *Kimberly A. Hintze–Wilce*, on the briefs).

*Philip A. Ross*, Designated Counsel, argued the cause for appellant Richard Bassi (*Susan L. Reisner*, Public Defender, attorney).

*Donald T. Thelander*, Assistant Deputy Public Defender, argued the cause for appellant Michael Harvan (*Susan L. Reisner*, Public Defender, attorney; *William P. Welaj*, Designated Counsel, on the letter brief).

*Robert E. Bonpietro*, Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz*, Attorney General of New Jersey, attorney).

*Harvey Weissbard* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Weissbard & Wiewiorka*, attorneys and *Crummy, Del Deo, Dolan, Griffinger & Vecchione*, attorneys; *Mr. Weissbard* and *Lawrence S. Lustberg*, on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

This criminal appeal arises from defendants' participation in an unlawful scheme to dump solid waste generated in New York at several unauthorized New Jersey sites. Defendants were prosecuted and convicted under the New Jersey Racketeer Influenced and Corrupt Organizations Act, commonly referred to as the RICO Act. In appealing their convictions, defendants raised several RICO issues, as well as many non-RICO issues. The Appellate Division affirmed the convictions. 268 *N.J.Super.* 72, 632 *A.*2d 1222 (1993). This Court granted defendants' petitions

for certification, "limited solely to the issues raised regarding construction of the New Jersey Racketeer Influenced and Corrupt Organizations Act." 135 *N.J.* 304, 305, 639 *A.*2d 304 (1994).

The RICO Act, generally, makes it a crime for a person to be employed by or associated with "an enterprise" and to engage or participate or become involved in the business of the enterprise "through a pattern of racketeering activity." *N.J.S.A.* 2C:41–2b and 2c. The Act also makes it a crime for a person to conspire to engage in such conduct. *N.J.S.A.* 2C:41–2d. Defendants were prosecuted and convicted under those provisions of the RICO Act.

The meaning and application of those provisions constitute the central inquiry in this appeal. Ultimately, in light of our interpretation of the RICO Act, the appeal presents the questions of whether the trial court adequately instructed the jury with respect to the proper understanding and application of the critical RICO provisions, and whether the evidence was sufficient to support the RICO convictions under those provisions.

I

The Legislature adopted the New Jersey Racketeer Influenced and Corrupt Organizations Act, *N.J.S.A.* 2C:41–1 to –6.2, in 1981. Convictions in this case were based on violations of *N.J.S.A.* 2C:41–2c and 2d. The extensive evidence introduced at trial is recited in detail in the opinion of the Appellate Division. 268 *N.J.Super.* at 82–88, 632 *A.*2d 1222. That evidence, for the most part not disputed, consisted of testimony of witnesses to the dumpings, surveillance videotapes, recorded telephone conversations, and records created and maintained by the various defendants.

Defendants Michael Harvan and Richard Bassi were the "dirt brokers" who arranged for and operated the illegal dump sites in North Bergen, Newark, and at the Hackensack Meadowlands Development Commission (HMDC) baling facility. They located property to be filled and recruited haulers looking for inexpensive places to dump. Defendants George Hurtuk, Joseph Dulanie, and

Joseph Mocco were North Bergen public officials who accepted cash bribes to protect and promote the illicit landfills in that town. At the time of the scheme, Hurtuk was the license inspector, Dulanie was the deputy chief of police, and Mocco was the town clerk. Also necessary to the operation were haulers such as defendant Patrick Ball, since deceased, who carted the waste from New York and disposed of it at the sites arranged by Bassi and Harvan at a lower cost than they would have had to pay to dump in New York. Other participants in the dumping scheme included the lookouts at the dump sites, a money launderer, and a "fixer," who handled any problems that arose during the operation.

The HMDC is a state agency controlling zoning and planning in all or part of fourteen towns comprising the Hackensack Meadowlands. The portions of North Bergen in which the dumping occurred are within that area. Any landfill within the area needed permits from the HMDC and from the Department of Environmental Protection (DEP). To avoid obtaining the agency permits, Bassi and Harvan bribed the North Bergen public-official defendants to gain their permission to dump debris at both the sites in North Bergen and the HMDC baler, and to obtain their assurance that they would intercept and handle any permit problems.

The evidence indicates that the dumping in North Bergen began in January 1986 at 83rd Street and West Side Avenue. That month, a North Bergen police officer encountered the dumping activity while Harvan was present. Harvan told him that he was in charge of the trucks at the site and that Hurtuk, the town license inspector, had given him permission to use the property for dumping.

In February, the dumping moved to a site near 69th Street and West Side Avenue. For that site, Harvan hired a night checker for $150 a day to copy the license-plate numbers of the trucks dumping there and to record the number of loads dumped each night. The night checker testified that Harvan was present at the site every night it operated and that both Bassi and Hurtuk were present on the first night the site was used. Harvan instructed

the checker to call Hurtuk if he had any trouble at the site. The police investigated the dumping several times, and eventually an order from Hurtuk was posted at police headquarters stating that dumping was permitted at the 69th Street location.

In March, the dumping moved to another area near 83rd Street. Later that month, both the Division of Criminal Justice (DCJ) and the HMDC began investigating the landfill operation. When DCJ personnel inquired about the dumping, the town clerk, Mocco, assured the investigators that HMDC had granted permission for the dumping, although it had not, and produced a license issued to a fictitious M. Black.

Days later, the dumping ceased at 83rd Street and a new dump opened at the Walsh Trucking property. The DCJ surveillance continued, and the dumping proceeded at the Walsh site into the second week of May. The investigators saw Bassi, Harvan, Hurtuk, and Dulanie at the site during that period.

On May 15, pursuant to court orders, DCJ installed wiretaps on Bassi's home telephone. Shortly after one truck had become entangled in a utility wire and caused an explosion, in a recorded conversation, Harvan told Bassi that Mocco had told him " 'don't worry about [the wire] ... Keep rolling.'" The dumping continued at both the 83rd Street and Walsh sites and the enterprise also used the HMDC baling facility. The haulers who had contracted with Bassi and Harvan indicated on HMDC forms that the waste originated in a place approved for dumping at that baler, such as Clifton, when in fact the waste came from New York. In addition, the trucks had magnetic signs reading "Big M" or "Harbas Trucking" placed over the name painted on the side of the trucks.

By early June, the investigation had made dumping so risky that Bassi and Harvan told the haulers to take loaded trucks back to New York. Recorded conversations between Bassi and Harvan reveal that they were annoyed by their problems in North Bergen because they had paid their "rent" to the town officials. They

continued to work with the town officials, however, to try to resume dumping in North Bergen.

The enterprise was financially rewarding to all its participants. Seized financial records covering the period from February to June 1986 revealed that the billings of Harvan and Bassi for dumping totalled $888,220 and that they each netted approximately $300,000 to $350,000 from the operation. Written records of the expenses of the scheme covering a three-month period show payments ranging from $100 to $1,000 to the "boss" or "big guy," referring to Mocco, totalling $29,100; to the "chief," referring to Dulanie, totalling $42,100; and to the "fat man," referring to Hurtuk, totalling $27,500. The haulers benefitted from the operation because Bassi and Harvan charged approximately half of the estimated $575 that haulers would have had to pay to dump legally in New York.

On April 1, 1987, the grand jury handed down a 116–count indictment charging Bassi, Harvan, Hurtuk, Mocco, and Dulanie, among others, with various crimes including racketeering, conspiracy to commit racketeering, bribery, theft of services, falsifying and tampering with public records, forgery, and the unlawful engagement in the business of solid waste collection and disposal. Defendants' trial began on October 11, 1988, and lasted until April 17, 1989, and all were convicted of certain of the charges.

The jury found Bassi and Harvan guilty of conspiracy to commit racketeering, contrary to *N.J.S.A.* 2C:41–2d, and of racketeering, contrary to *N.J.S.A.* 2C:41–2c. It also found them both guilty of bribery, in violation of *N.J.S.A.* 2C:27–2c and –2d and *N.J.S.A.* 2C:2–6; uttering a forged instrument, in violation of *N.J.S.A.* 2C:21–1 and *N.J.S.A.* 2C:2–6; criminal mischief, contrary to *N.J.S.A.* 2C:17–3a and *N.J.S.A.* 2C:2–6; and engaging in solid-waste disposal without a certificate of public convenience, contrary to *N.J.S.A.* 48:13A–6 and *N.J.S.A.* 48:13A–12. The jury convicted Hurtuk, Dulanie, and Mocco of conspiracy to commit racketeering, contrary to *N.J.S.A.* 2C:41–2d, as well as of bribery, contrary to *N.J.S.A.* 2C:27–2c, and of official misconduct, contrary to *N.J.S.A.*

2C:30–2a. Dulanie and Hurtuk were also found guilty of official misconduct, in violation of *N.J.S.A.* 2C:30–2b. Lastly, Mocco and Hurtuk were convicted of bribery, in violation of *N.J.S.A.* 2C:27–2d.

The court sentenced both Bassi and Harvan to aggregate terms of seventeen years imprisonment and fined them each $150,000. It also imposed Violent Crimes Compensation Board (VCCB) penalties of $450 on each defendant. The court merged the conspiracy-to-commit-racketeering conviction with the racketeering conviction, but did not merge the other convictions with those for racketeering. The court sentenced Hurtuk to an aggregate prison term of fifteen years, and ordered him to make restitution in the amount of $27,000. The court also fined him $75,000 and imposed a VCCB penalty of $90. Dulanie was sentenced to an aggregate prison term of fifteen years, and was ordered to make restitution in the amount of $41,600. The court fined him $75,000 and imposed a VCCB penalty of $60. Mocco was sentenced to an aggregate prison term of twenty years, and ordered to make restitution in the amount of $56,300. The court fined him $200,000 and imposed a VCCB penalty of $90. The sentencing court did not merge any of the other convictions into the conspiracy-to-commit-racketeering conviction.

## II

The gravamen of a RICO violation, frequently referred to as "racketeering," is the involvement in the affairs of an enterprise through a pattern of racketeering activity. Specifically, the RICO Act provides:

> c. It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> d. It shall be unlawful for any person to conspire as defined in *N.J.S.* 2C:5–2, to violate any of the provisions of this section.
>
> [*N.J.S.A.* 2C:41–2.]

We consider first the interpretation to be accorded the term "enterprise." *N.J.S.A.* 2C:41–1 provides a definition:

c. "Enterprise" includes any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities.

■ At the outset we note that the definitions of "enterprise" in the federal and New Jersey RICO statutes are similar.[1]  Indeed, as originally introduced in the Assembly in February 1980, the New Jersey RICO statute paralleled federal RICO.  The Legislature, however, came to perceive purposes and goals to be achieved by the proposed anti-racketeering statute distinct from those of the federal statutory scheme.  Consequently, in many respects our Legislature departed from the federal example.  Nevertheless, because the federal statute served as an initial model for our own, we heed federal legislative history and case law in construing our statute.

The legislative history for federal RICO indicates that Congress' prime concern was the eradication of "organized crime." *United State v. Turkette*, 452 *U.S.* 576, 591, 101 *S.Ct.* 2524, 2532, 69 *L.Ed.*2d 246, 259 (1981).  Congress' specific intentions, though, were not in every respect apparent, and so there has evolved an extensive and variegated jurisprudence on federal RICO.  Among the subjects debated in the jurisprudence is the meaning of

---

[1] The statement of activities prohibited under Federal RICO reads:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

[18 *U.S.C.A.* § 1962.]

The federal RICO statute defines "enterprise" as follows:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

[18 *U.S.C.A.* § 1961.]

"enterprise." David Vitter, *The RICO Enterprise as Distinct from the Pattern of Racketeering Activity: Clarifying the Minority View*, 62 *Tul.L.Rev.* 1419 (1988).

The history of federal court attention to the problem of the meaning of "enterprise" begins, for our purposes, with the United States Supreme Court's decision in *Turkette, supra,* in which the Court considered the meaning of the federal statute's "enterprise" element. Prior to that decision, however, in New Jersey in 1978 an Organized Crime Task Force issued a Report. It noted that by 1968, New Jersey had acquired a national reputation as a haven for organized crime. Organized Crime Task Force, *Report* at 1 (1978) [hereinafter *Report* ]. The Report evaluated the steps New Jersey had taken to protect the integrity of local government and law enforcement agencies, and made recommendations for improving efforts to eradicate organized crime in this State. The Task Force focused on the problem of infiltration of organized crime into government and legitimate businesses.

The Legislature, however, refused to limit the statute's application to cases of infiltration of legitimate business by organized crime. *N.J.S.A.* 2C:41–1c. Moreover, the Legislature decided not to limit the statute's application only to such traditional organized crime interests as the Mafia. Instead, the Legislature determined that the statute should · broadly cover "organized crime type activities." *N.J.S.A.* 2C:41–1.1c.

In 1981, the year of the enactment of the New Jersey statute, the Supreme Court decided *Turkette, supra.* The Supreme Court considered whether "enterprise" under .RICO encompassed wholly illegitimate as well as legitimate enterprises. It concluded that illegitimate enterprises were covered, noting that although the main aim of the legislation was to prevent the infiltration of criminal elements into legitimate businesses, the statutory language was not so limited. 452 *U.S.* at 580, 101 *S.Ct.* at 2527, 69 *L.Ed.*2d at 253. The Court defined "an enterprise" as "a group of persons associated together for a common purpose of engaging in a course of conduct," and held that an enterprise is established by

"evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 583, 101 *S.Ct.* at 2528–29, 69 *L.Ed.*2d at 254.

In addition to interpreting "enterprise," the Supreme Court in *Turkette* stated that prosecutors bear the burden of proof under RICO to show the existence of both an enterprise and a pattern of racketeering activity; although the proof used to establish the separate elements may "coalesce," proof of one would not necessarily establish the other. *Id.* at 583, 101 *S.Ct.* at 2528–29, 69 *L.Ed.*2d at 254–55. The Court thus took care to distinguish the "enterprise" element from the "pattern of racketeering activity" element, stating that the enterprise "is an entity separate and apart from the pattern of activity in which it engages." *Id.* at 583, 101 *S.Ct.* at 2525, 69 *L.Ed.*2d at 255.

After *Turkette,* federal courts struggled to apply its rule to particular cases. The Third Circuit Court of Appeals in *United States v. Riccobene,* 709 *F.*2d 214, 221–24, *cert. denied,* 464 *U.S.* 849, 104 *S.Ct.* 157, 78 *L.Ed.*2d 145 (1983), determined that according to *Turkette,* an enterprise had three components: an ongoing organization, continuing membership, and a separateness, and that the establishment of an "enterprise" required proof of "some sort of structure." *Id.* at 222. The Eighth Circuit Court of Appeals concluded that the "enterprise" element required proof of an "ascertainable structure" distinct from such organization as is necessary to the coordinated act of racketeering. *United States v. Bledsoe,* 674 *F.*2d 647, 665, *cert. denied,* 459 *U.S.* 1040, 103 *S.Ct.* 456, 74 *L.Ed.*2d 608 (1982). In *Bledsoe,* the court explained that proof of an "ascertainable structure" is essential to avoid collapsing the two components of a RICO crime—the involvement in a distinct enterprise and in a pattern of racketeering activity—into a single component. 674 *F.*2d at 663–65.

Several courts have rejected the view that a distinct "ascertainable structure" is a necessary component of a RICO enterprise. Those courts have applied *Turkette* literally, requiring proof only of an ongoing informal organization. *See, e.g., United States v.*

*Cagnina,* 697 *F.*2d 915, 921 (11th Cir.), *cert. denied,* 464 *U.S.* 856, 104 *S.Ct.* 175, 78 *L.Ed.*2d 157 (1983); *United States v. Pelullo,* 964 *F.*2d 193, 212 (3rd Cir.1992); *United States v. Perholtz,* 842 *F.*2d 343, 362–63 (D.C.Cir.), *cert. denied,* 488 *U.S.* 821, 109 *S.Ct.* 65, 102 *L.Ed.*2d 42 (1988); *United States v. Mazzei,* 700 *F.*2d 85, 89–90 (2nd Cir.), *cert. denied,* 461 *U.S.* 945, 103 *S.Ct.* 2124, 77 *L.Ed.*2d 1304 (1983). In *United States v. Bagaric,* 706 *F.*2d 42, 56, *cert. denied,* 464 *U.S.* 840, 917, 104 *S.Ct.* 133, 134, 283, 78 *L.Ed.*2d 128, 261 (1983), the Second Circuit Court of Appeals took perhaps the broadest approach in stating that "any associative group" may be characterized "in terms of what it *does,* rather than by abstract analysis of its structure." (emphasis in original). The Eleventh Circuit Court of Appeals observed in *United States v. Weinstein,* 762 *F.*2d 1522, 1537 (1985), *cert. denied,* 475 *U.S.* 1110, 106 *S.Ct.* 1519, 89 *L.Ed.*2d 917 (1986), that "the definitive factor in determining the existence of a RICO enterprise [is] an association of individuals, however loose or informal, which furnishes a vehicle for the commission of two or more predicate crimes." *See* Vitter, *supra,* 62 *Tul.L.Rev.* at 1438–40 (noting that distinctness of enterprise is evidenced by many traits, including "a decision-making structure" and "an advanced division of labor").

Over thirty states have some form of anti-racketeering act, all of which are modeled generally on federal RICO. Georgia, New Mexico, and Oregon have rejected the position that an ascertainable structure distinct from the pattern of racketeering activity is required to prove an enterprise. *See Martin v. State,* 189 *Ga.App.* 483, 376 *S.E.*2d 888, 892–93 (1988); *State v. Hughes,* 108 *N.M.* 143, 148–49, 767 *P.*2d 382, 387–88 (App.1988); *State v. Cheek,* 100 *Or.App.* 501, 786 *P.*2d 1305, 1307–08 (1990). In contrast, Florida, and New York (whose statute is unique in that it explicitly requires an enterprise to have "an ascertainable structure distinct from a pattern of racketeering activity," *N.Y. Penal Law* § 460.10(3) (McKinney 1989)) insist that the State establish that the alleged enterprise had a structure and that it was separate from the pattern of racketeering activity. *See Boyd v. State,* 578 *So.*2d 718, 721–22 (Fla.App.1991), *review den.* 581 *So.*2d 1310

(Fla.1991); *People v. Wakefield Fin. Corp.*, 155 *Misc.*2d 775, 590 *N.Y.S.*2d 382, 388–89 (Sup.Ct.1992). Minnesota requires a showing "that there is an organizational set-up, whether formal or informal, that not only exists to commit the predicate acts but also does more, such as coordinating those acts into an overall pattern of criminal activity." *State v. Huynh*, 519 *N.W.*2d 191, 196 (Minn.1994). Idaho and Pennsylvania rely on *Turkette* for their definitions of "enterprise." See *State v. Hansen*, 125 *Idaho* 927, 930–33, 877 *P.*2d 898, 901–03 (1994); *Commonwealth v. Donahue*, 428 *Pa.Super.* 259, 630 *A.*2d 1238, 1245–46 (1993), *review den.* 538 Pa. 612, 645 *A.*2d 1316 (1994).

Clearly, courts have not found any one uncontroversial definition of "enterprise." Indeed, an empirical study indicates that, even as used in common parlance, the word "enterprise" has no single, well-established meaning. *See* Clark D. Cunningham, et al., *Plain Meaning and Hard Cases*, 103 *Yale L.J.* 1561 (1994).

The Appellate Division here reasoned that " 'the nature of the misconduct often provides the best clue toward defining the enterprise.... [I]t is logical to characterize any associative group in terms of what it *does*, rather than by abstract analysis of its structure.' " 268 *N.J.Super.* at 107, 632 *A.*2d 1222 (quoting *Bagaric, supra*, 706 *F.*2d at 55–56). It accordingly held that

> [t]he "enterprise" element will be satisfied if there exists a group of people, no matter how loosely associated, whose existence or association provides or implements the common purpose of committing two or more predicate acts. We go so far as to hold [that] the "enterprise" element is satisfied if the "enterprise" is no more than the sum of the racketeering acts. Thus, the "enterprise" does not have to be an organization whose purpose is greater than the predicate acts, nor does it have to evidence any definable structure.
>
> [268 *N.J.Super.* at 143, 632 *A.*2d 1222.]

Our understanding of the term "enterprise" is derived from the extensive legislative history and decisional law dealing with both the State and federal RICO statutes. Those sources support the following conclusions. First, the RICO statute itself in using the term "enterprise" contains no express or implied requirement for a distinct ascertainable structure; rather, it is framed broadly to include any group of persons "associated in fact." Second, the

legislative history shows that the term "enterprise" was meant to be construed broadly. The statute itself, *N.J.S.A.* 2C:41–6, commands the liberal construction of "enterprise." The drafters intended New Jersey RICO to encompass more than traditional organized-crime families, which commonly contain an internal command system or structure. Rather, the Legislature intended its statute to reach less organized and non-traditional criminal elements as well.[2] Assembly Judiciary, Law, Public Safety and Defense Committee, *Meeting on A–1079*, at 1 (Oct. 30, 1980) [hereinafter, *Committee Meeting.*] Further, the definition of "enterprise" was changed to include sole proprietorships, business and charitable trusts, illicit enterprises, and governmental "as well as other entities," *N.J.S.A.* 2C:41–1c, which changes were meant "to broaden the definition of enterprise." *See Committee Meeting, supra.*

In addition, the Legislature's intent not to cover small-scale operations by its broad definition of "enterprise" was expressed in the statement in the Declaration of Policy and Legislative Findings, *N.J.S.A.* 2C:41–1.1c, that the Act should target only organized-crime-type activities that are substantial in nature. *See also Committee Meeting* at 2 (RICO sanctions are directed toward "substantial organized crime activity."). Lastly, the Supreme Court's discussion of enterprise in *Turkette* refers to organization, not structure, and fairly understood, required only an informal organization functioning as a continuing unit.

■ Accordingly, we hold, first, that under the RICO Act "enterprise" is an element separate from the "pattern of racke-

---

[2] For example, the Assembly Committee recognized that a scheme to defraud the Medicaid system by a New Jersey couple or a group associated for the purpose of throwing a business into bankruptcy to defraud investors were "enterprises" within RICO's definition of the term. In discussing examples of what activities the Act targeted, the members agreed that the bill intended "to get away from the stereotype of using the term, "Mafia"; rather, the Act would cover any situation in which a few persons exerted significant control over the social and political fabric of a community through illicit profits. *Committee Meeting, supra,* at 3–4.

teering activity," and that the State must prove the existence of both in order to establish a RICO violation. The offenses proscribed in *N.J.S.A.* 2C:41–2a to –2d include both as elements of the crime. The enterprise is the association, and the pattern of racketeering activity consists of the predicate incidents. Nevertheless, evidence that serves to establish such an enterprise need not be distinct or different from the proof that establishes the pattern of racketeering activity.

We hold, further, that because the enterprise is distinct from the incidents constituting the pattern of activity, it must have an "organization." The organization of an enterprise need not feature an ascertainable structure or a structure with a particular configuration. The hallmark of an enterprise's organization consists rather in those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose. The division of labor and the separation of functions undertaken by the participants serve as the distinguishing marks of the "enterprise" because when a group does so divide and assemble its labors in order to accomplish its criminal purposes, it must necessarily engage in a high degree of planning, cooperation and coordination, and thus, in effect, constitute itself as an "organization."

This understanding of the kind of organization that establishes an "enterprise" is different from, but not necessarily inconsistent with, that understanding of "enterprise" premised on an "ascertainable structure." Thus, evidence showing an ascertainable structure will support the inference that the group engaged in carefully planned and highly coordinated criminal activity, and therefore will support the conclusion that an "enterprise" existed. Apart from an organization's structure as such, however, the focus of the evidence must be on the number of people involved and their knowledge of the objectives of their association, how the participants associated with each other, whether the participants each performed discrete roles in carrying out the scheme, the level of planning involved, how decisions were made,

the coordination involved in implementing decisions, and how frequently the group engaged in incidents or committed acts of racketeering activity, and the length of time between them.

## III

The second major interpretive issue in the case involves the content of the element of "pattern of racketeering activity." We must consider, further, whether use of this phrase renders the statute unconstitutionally vague.

For criminal liability under RICO to attach, a defendant's involvement in an enterprise must be accomplished "through a pattern of racketeering activity." *N.J.S.A.* 2C:41–2c. A "pattern of racketeering activity," according to *N.J.S.A.* 2C:41–1d, requires:

(1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and

(2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

The New Jersey definition descends from the briefer federal definition of "pattern of racketeering activity." [3] The debate over how to interpret the federal "pattern of racketeering activity," 18 *U.S.C.A.* § 1961(5), began with *Sedima, S.P.R.L. v. Imrex Co.,* 473 *U.S.* 479, 105 *S.Ct.* 3275, 87 *L.Ed.*2d 346 (1985). In a footnote, the Supreme Court noted that the definition of "pattern of racketeering activity" differs from the other definitions of the federal RICO statute in that it states that a pattern *requires* at least two predicate acts, not that it *means* two such acts. 473 *U.S.* at 496 n.

---

[3] The federal RICO statute defines "pattern of racketeering" activity as follows:

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; [18 *U.S.C.A.* § 1961.]

14, 105 *S.Ct.* at 3285 n. 14, 87 *L.Ed.*2d at 358 n. 14.    Observing that two of anything rarely forms a "pattern," the Court stated that the statute implied that although two acts are necessary, they may not be sufficient.    *Ibid.*

The signal in *Sedima* produced decisional conflicts among the circuits, which the Supreme Court resolved in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 *U.S.* 229, 109 *S.Ct.* 2893, 106 *L.Ed.*2d 195 (1989).    The Supreme Court determined in *H.J. Inc.* that the statutory definition of "pattern of racketeering activity," by using the term "requires," placed a broad "outer limit" on the concept of two predicate acts.    *Id.* at 237, 109 *S.Ct.* at 2899, 106 *L.Ed.*2d at 206.    From the legislative history, the Court deduced that " '[i]t is th[e] factor of *continuity plus relationship* which combines to produce a pattern.' "    *Id.* at 239, 109 *S.Ct.* at 2900, 106 *L.Ed.*2d at 208 (quoting 116 Cong.Rec., at 18940 (1970) (emphasis added)).    Thus, according to the Court, proof of a pattern required a showing that the predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity."    *Ibid.*

The relatedness requirement, the Court explained, covers " 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' "    *Id.* at 240, 109 *S.Ct.* at 2901, 106 *L.Ed.*2d at 208 (quoting and deriving its definition from the Dangerous Special Offender Act, 18 *U.S.C.A.* § 3575(e), enacted in conjunction with RICO).

"Continuity," according to the Court, is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.    It is, in either case, centrally a temporal concept."    *Id.* at 241–42, 109 *S.Ct.* at 2902, 106 *L.Ed.*2d at 209 (citation omitted).    The Court further determined that although relatedness and continuity make up two distinct prongs of the "pattern" requirement, proof of the two "will often overlap." *Id.* at 239, 109 *S.Ct.* at 2900, 106 *L.Ed.*2d at 208.

The meaning of "pattern of racketeering activity" has long perplexed courts. Indeed, before the United States Supreme Court declared a definitive federal interpretation of the "pattern of racketeering activity" element, lower federal courts produced a variety of interpretations. Lisa Barsoomian, *RICO "Pattern" Before and After H.J. Inc.: A Proposed Definition*, 40 *Am. U.L.Rev.* 919, 925 (1991) (identifying five distinct understandings of the element).

The Eighth Circuit Court of Appeals read "pattern of racketeering activity" to require proof that the criminal enterprise operates at least two distinct, unconnected schemes. *See Phenix Fed. Sav. & Loan v. Shearson Loeb Rhoades, Inc.*, 856 *F.*2d 1125, 1128 (1988), *cert. denied*, 489 *U.S.* 1066, 109 *S.Ct.* 1340, 103 *L.Ed.*2d 810 (1989). Other federal courts understood "pattern of racketeering activity" to require not two distinct schemes, but rather only participation "in two or more predicate acts or crimes," *e.g.*, *United States v. Alexander*, 850 *F.*2d 1500, 1506 (11th Cir.1988), *cert. denied*, 489 *U.S.* 1068, 109 *S.Ct.* 1346, 103 *L.Ed.*2d 814 (1989), without the need to show some cogent relationship connecting the plurality of acts. *E.g.*, *United States v. Elliott*, 571 *F.*2d 880, 897 n. 23 (5th Cir.1978), *cert. denied* 439 *U.S.* 953, 99 *S.Ct.* 349, 58 *L.Ed.*2d 344 (1978). Some federal courts before *H.J. Inc.* adopted a "totality of the circumstances" approach, *e.g.*, *United States v. Indelicato*, 865 *F.*2d 1370, 1381 (2d Cir.), *cert. denied*, 493 *U.S.* 811, 110 *S.Ct.* 56, 107 *L.Ed.*2d 24 (1989); *United States v. Zauber*, 857 *F.*2d 137, 149 (3d Cir.1988), *cert. denied*, 489 *U.S.* 1066, 109 *S.Ct.* 1340, 103 *L.Ed.*2d 810 (1989); *Barticheck v. Fidelity Union Bank*, 832 *F.*2d 36, 39 (3d Cir.1987); *cf. Tabas v. Tabas*, 47 *F.*3d 1280, 1292–93 (3d Cir.1995) (abandoning totality of circumstances approach in light of *H.J., Inc.*).

State definitions of "pattern" also have significantly varied. The state statutes differ from New Jersey's and from one another in a variety of ways and those differences have, ultimately, influenced judicial interpretations. For example, New Jersey is the only state that provides that the pattern consists of at least two

"incidents," as opposed to "acts." The statute also *requires* that at least two of the "incidents" of racketeering be related to each other. *Cf. Fla.Stat.Ann.* § 895.02(4) (West 1994) (providing, unlike New Jersey, pattern *means* at least two acts that are related to each other); *Ga.Code Ann.* § 16–14–3(8) (Michie 1992) (same); *Idaho Code* § 18–7803(d) (Michie 1987) (same); *Ind.Code* § 35–45–6–1 (Michie 1987) (same); *see also Col.Rev.Stat.Ann.* § 18–17–103(3) (West 1986) (same and providing also a relation of acts to the enterprise); *Or.Rev.Stat.* § 166.715(4) (1993) (same). Some states have adopted a "relationship and continuity" interpretation of their pattern of racketeering activity element. *E.g., State v. Lucas,* 600 *So.*2d 1093, 1094–96 (Fla.1992); *Kollar v. State,* 556 *N.E.*2d 936, 940–41 (Ind.App.1990). Others reject the "continuity" element of the *H.J. Inc.* test. *E.g., People v. Chaussee,* 880 *P.*2d 749, 753–59 (Colo.1994); *Larson v. Smith,* 194 *Ga.App.* 698, 391 *S.E.*2d 686, 688 (1990); *Computer Concepts, Inc. v. Brandt,* 310 *Or.* 706, 801 *P.*2d 800, 807–09 (1990).

In ascertaining the meaning of "pattern of racketeering activity," the Appellate Division concluded that the New Jersey statute required relatedness but not continuity. It determined that "to establish a 'pattern[,]' it need * * * be shown [only that] the predicate acts are related. It is not necessary to show continuity as required under Federal RICO." 268 *N.J.Super.* at 144, 632 *A.*2d 1222.

In reaching that conclusion, the Appellate Division found explicit support in the statute itself for the relatedness requirement, *see N.J.S.A.* 2C:41–1d(2), but none for a requirement of continuity. 268 *N.J.Super.* at 142–43, 632 *A.*2d 1222. The court found persuasive the Oregon Supreme Court's reasoning in *Computer Concepts, supra,* 801 *P.*2d at 807–09, which emphasizes that the Oregon statute expressly defines pattern in terms of relatedness and that its legislature had not focused only on long-term or future-oriented racketeering. Similarly, the Appellate Division noted that the "Declaration of Policy and Legislative Findings" contained in *N.J.S.A.* 2C:41–1.1 did not refer to "long term

criminal activity," but rather aimed to eliminate all organized criminal activity, regardless of duration. *Id.* at 142, 632 *A.*2d 1222. The court also found that the New Jersey Legislature intended its RICO statute to be even broader in scope than the federal act. *Id.* at 107, 632 *A.*2d 1222.

■ The Appellate Division reasonably found in the statute and its legislative history an intent on the part of the Legislature not to require "continuity" as an element of "pattern of racketeering activity," at least not in any strong or distinctive sense of the term. We do not conclude, however, that "continuity" is irrelevant to demonstrating a "pattern of racketeering activity." We note that in discussing the definition of "pattern of racketeering activity," the Assembly Committee observed that the new version "substituted 'incident' for 'act' because "act" is a somewhat restrictive term ... whereas an incident more aptly represents—a circumstance or happening." *Committee Meeting* at 7. We infer from the preference for the word "incident," with its perceived meaning of "happening" or "circumstance," that the Legislature intended to cover a broader spectrum of behavior than is connoted by "act." The pattern of racketeering activity and the activity criminalized under RICO should be, or threaten to be, ongoing.

In addition, the Legislature expressed its clear concern that the underlying incidents not be isolated events. *Ibid.* Chairman Herman remarked that criminal activity may have "interruptions" without thereby defeating the "pattern" element. A member of the Committee also commented that criminal activity "doesn't have to be continuous, in other words. You can have interruptions." Thus, the Committee recognized that there had to be some "connective tissue among criminal incidents," but that it need not be continuous in the sense of completely uninterrupted as long as the incidents are not isolated or disconnected.

■ Thus, RICO was not designed to punish mere repeated offenses. *Id.* at 8. The Deputy Attorney General acknowledged that to be consistent with the Legislature's declaration of purpose the pattern must be more than just a string of two or more

similarly-committed crimes. *Id.* at 2. Indeed, our statute expressly enjoins use of the RICO statute to cover isolated criminal incidents. *N.J.S.A.* 2C:41–1d(2). Thus, "continuity," understood as an antonym of the terms "isolated" or "sporadic," points to "incidents of criminal conduct" that exhibit some ongoing connection. *E.g., Indelicato, supra,* 865 *F.*2d at 1383; *Sun Savings & Loan Ass'n v. Dierdorff,* 825 *F.*2d 187, 192 (9th Cir.1987). We agree with Amicus that the statute itself implies some ongoing connection or continuity also in its express specification that "incidents of racketeering activity embrace criminal conduct that [is] ... otherwise *interrelated* by distinguishing characteristics...." *N.J.S.A.* 2C:41–1d(2) (emphasis added).

We thus conclude that some degree of continuity, or threat of continuity, is required and is inherent in the "relatedness" element of the "pattern of racketeering activity."

Obviously, different interpretative avenues present themselves. Although we do not require "continuity" as a distinctive sub-element of "pattern," we find sound and persuasive the reasoning of those courts that use a "totality of the circumstances" approach in applying the federal "continuity plus relationship" test for determining the existence of a pattern of racketeering activity. *See, e.g., Banks v. Wolk,* 918 *F.*2d 418, 423 (3rd Cir.1990) (finding multi-factor test to survive *H.J., Inc.*). The theory underlying this totality-of-the-circumstances standard was articulated in *Indelicato, supra.* It interpreted footnote 14 of *Sedima, supra,* as

> not enshrin[ing] 'continuity plus relationship' as a determinative two-pronged test. Rather, the [United States Supreme] Court quotes this language to demonstrate how the pattern requirement should be interpreted to prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts.
>
> [865 *F.*2d at 1383 (quoting *Sun Savings & Loan Ass'n, supra,* 825 *F.*2d at 192).]

The factor of "continuity," as acknowledged by the Supreme Court in *H.J. Inc.,* may itself be established by evidence that overlaps the evidence establishing "relatedness." 492 *U.S.* at 239, 109 *S.Ct.* at 2900, 106 *L.Ed.*2d at 208. As the court in *Zauber* stated:

> [a] combination of specific factors, "such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number

of victims, the number of perpetrators, and the character of the unlawful activity" could be considered in determining whether a pattern existed.

[857 *F.*2d at 149 (quoting and applying holding of *Barticheck v. Fidelity Union Bank, supra,* 832 *F.*2d at 39).]

An understanding of "relatedness" based on a totality of circumstances is compatible with the statutory definition that enumerates several factors—purposes, results, participants, victims and methods and other characteristics—that may combine or be "otherwise interrelated" to establish a pattern from the "incidents of racketeering activity" that in any event may not be "isolated." *N.J.S.A.* 2C:41–1d(2).

In the most likely setting, predicate incidents of racketeering conduct will occur sequentially over a period of time. New Jersey's legislative discussions, unlike Congress', do not indicate a concern for reaching only long-term criminal activity. But short-term criminal activity, to be covered, must encompass incidents of criminal conduct that are not disconnected or isolated. Incidents of racketeering that occur sequentially, to overcome any inference that they are totally disconnected or isolated, must exhibit some temporal connection or continuity over time.

Accordingly, we conclude that the primary criterion of New Jersey's "pattern of racketeering activity" is "relatedness." That calls for the application of a broad standard involving the totality of all relevant circumstances, which may include "continuity."

■ We consider further defendant's contention that the RICO statute, particularly its provision for "pattern of racketeering activity," is unconstitutionally vague. The Appellate Division found that the term "pattern of racketeering activity" was not vague. 268 *N.J.Super.* at 144, 632 *A.*2d 1222. We agree.

■ Vagueness challenges to RICO statutes have been rejected by every circuit to consider the issue. *United States v. Dischner,* 974 *F.*2d 1502, 1508 (9th Cir.1992), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 1290, 122 *L.Ed.*2d 682 (1993). Those courts confirm that the lack of clarity in RICO does not necessarily mean that a vagueness challenge will succeed. *See, e.g., United States v.*

*Woods,* 915 *F.*2d 854, 862–64 (3rd Cir.1990), *cert. denied,* 499 *U.S.* 947, 111 *S.Ct.* 1413, 113 *L.Ed.*2d 466 (1991); *United States v. Angiulo,* 8⬛ *F.*2d 1169, 1178–80 (1st Cir.), *cert. denied,* 498 *U.S.* 845, 111 *S.Ct.* 130, 112 *L.Ed.*2d 98 (1990); *United States v. Van Dorn,* 925 *F.*2d 1331, 1334 n. 2 (11th Cir.1991); *United States v. Glecier,* 923 *F.*2d 496, 497 n. 1 (7th Cir.), *cert. denied,* 502 *U.S.* 810, 112 *S.Ct.* 54, 116 *L.Ed.*2d 31 (1991); *United States v. Coiro,* 922 *F.*2d 1008, 1017 (2nd Cir.), *cert. denied,* 501 *U.S.* 1217, 111 *S.Ct.* 2826, 115 *L.Ed.*2d 996 (1991). Potential uncertainty in marginal fact situations does not render RICO vague with respect to the challenging defendant's conduct. *Dischner, supra,* 974 *F.*2d at 1510.

The United States Supreme Court has not squarely confronted a RICO "vagueness" challenge, but it has supplied some clues about its views. In *Fort Wayne Books, Inc. v. Indiana,* 489 *U.S.* 46, 58, 109 *S.Ct.* 916, 924–25, 103 *L.Ed.*2d 34, 48 (1989), the Court found that Indiana RICO was not vague as applied in the context of the defendants' obscenity predicate offenses. The Court observed that RICO is inherently *less* vague than any of the statutes criminalizing the predicate acts because "a prosecution under the RICO law will be possible only where all the elements of [the underlying offense] are present, and then some." *Id.* at 58 n. 7, 109 *S.Ct.* at 925 n. 7, 103 *L.Ed.*2d at 48 n. 7. *See H.J., Inc., supra,* 492 *U.S.* 229, 235, 109 *S.Ct.* 2893, 2898, 106 *L.Ed.*2d 195, 205 (rejecting a similar challenge in the course of interpreting "pattern of racketeering activity").

A statute is vague on its face if "there is no conduct that it proscribes with sufficient certainty." *State v. Cameron,* 100 *N.J.* 586, 593, 498 *A.*2d 1217 (1985). A statute may also be vague as applied if "the law does not with sufficient clarity prohibit the conduct against which it is sought to be enforced." *Ibid.*

⬛ The Appellate Division concluded that defendants had not demonstrated that the statute's definition of "pattern" failed to put them on notice that their behavior constituted a pattern of racketeering activity under RICO. 268 *N.J.Super.* at 117, 632 *A.*2d

1222. The court correctly noted that to succeed in an as-applied challenge to RICO, a defendant must show that RICO could not reasonably be applied to his or her alleged conduct. *Id.* at 117, 632 *A.*2d 1222. The court also found that even if RICO may be unconstitutionally vague in some marginal situations, it was not vague with respect to these defendants, whose actions involved submitting fraudulent forms at the baler, bribing public officials for licenses, and money laundering. *Id.* at 117–18, 632 *A.*2d 1222. *See State v. Passante,* 225 *N.J.Super.* 439, 446–50, 542 *A.*2d 952 (Law Div.1987).

We conclude that the term "pattern of racketeering activity" is not unconstitutionally vague. The statute makes clear that when certain conduct that the Legislature has already made criminal is committed in a certain way with a certain purpose, it will carry an enhanced penalty. The term is also not vague as applied to defendants. Any person of ordinary intelligence would realize that defendants' activities constituted conduct that the law proscribed.

## IV

The State charged that the defendants "participate[d], directly or indirectly, in the conduct of the enterprise's affairs," in violation of *N.J.S.A.* 2C:41–2c. Defendants were also charged under *N.J.S.A.* 2C:41–2d, which provides that "(i)t shall be unlawful for any person to conspire as defined by *N.J.S.* 2C:5–2, to violate any of the provisions of this section." Defendants contend that the State failed to prove that they had participated in the affairs of an enterprise or that they conspired to engage in such unlawful participation. The issues with respect to the meaning and application of these provisions are interrelated.

### A.

*N.J.S.A.* 2C:41–2c, as earlier noted, provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In drafting this section of the statute, the Legislature again for guidance looked to the parallel provision of the federal RICO statute, 18 *U.S.C.* § 1962(c), which uses virtually the same terms.

The United States Supreme Court in *Reves v. Ernst & Young*, 507 *U.S.* ——, 113 *S.Ct.* 1163, 122 *L.Ed.*2d 525 (1993), interpreted the phrase "to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs," a phrase identical to that used in the New Jersey provision. The Court concluded that as both a noun and a verb, the word "conduct" required an element of direction, and "participate" meant "to take part in." Thus, to satisfy subsection (c), according to the Court, one must have some part in directing the affairs of the enterprise, and hence the Court imposed an "operation or management" test. *Id.* at ——, 113 *S.Ct.* at 1169–70, 122 *L.Ed.*2d at 536–37.

Justice Souter, joined by Justice White, dissented. He stated that the noun "conduct" simply meant "carrying forward" and implied no element of direction. *Id.* at ——, 113 *S.Ct.* at 1174, 122 *L.Ed.*2d at 542. Moreover, even if the Court "call[ed] it a tie" on the definitional analysis, the liberal-construction clause counseled against the majority's narrower reading. *Id.* at ——, 113 *S.Ct.* at 1175, 122 *L.Ed.*2d at 542–43. *See* Bryan T. Camp, *Dual Construction of RICO: The Road Not Taken in Reves*, 51 *Wash & Lee L.Rev.* 61, 78–79 (1994) (questioning the reasoning by which the Supreme Court deduced the existence of the "operation-or-management" test).

Until the decision in *Reves, supra*, the operation-or-management test had not gained general acceptance in the federal courts. Some courts did anticipate the Supreme Court's ultimate decision and applied an operation-or-management test. *See, e.g., United States v. Mandel*, 591 *F.*2d 1347, 1374–75 (4th Cir.1979), *rehearing den.* 609 *F.*2d 1076 (4th Cir.1979), *cert. denied*, 445 *U.S.* 961, 100 *S.Ct.* 1647, 64 *L.Ed.*2d 236 (1980); *Bennett v. Berg*, 710 *F.*2d 1361,

1364 (8th Cir.1983) (en banc), *cert. denied sub nom Prudential Ins. Co. of America v. Bennett,* 464 *U.S.* 1008, 104 *S.Ct.* 527, 78 *L.Ed.*2d 710 (1983). Other federal courts interpreted the "conduct or participate" language of the RICO statute to require an even greater showing of supervisory authority. *E.g., Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 *F.*2d 948, 954 (D.C.Cir.1990), *cert. denied,* 501 *U.S.* 1222, 111 *S.Ct.* 2839, 115 *L.Ed.*2d 1007 (1991) (holding that defendant must "exercise[ ] significant control over or within an enterprise," such as by participat[ing] in directing the enterprise toward its ... goals or participat[ing] in exercising control over an enterprise so as to reset its goals"). Finally, some federal courts found the "conduct or participate" element not to require any showing of supervisory authority. *E.g., United States v. Scotto,* 641 *F.*2d 47, 54 (2d Cir.1980), *cert. denied* 452 *U.S.* 961, 101 *S.Ct.* 3109, 69 *L.Ed.*2d 971 (1981) (ruling that "conduct of the activities of an enterprise through a pattern of racketeering" can be done "by virtue of [one's] position in the enterprise or involvement in ... affairs of the enterprise" or when "the predicate offenses are related to the activities" of the enterprise); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 *F.Supp.* 49, 86–87 (S.D.Ohio 1986) (ruling that under "the precise language of the one statute," participation "means to perform activities necessary or helpful to the operation of the enterprise, whether directly or indirectly").

Our own legislative history relating to the question of the nature of participation necessary for a RICO conviction is sparse. However, in enacting the statute, the Legislature sought "to prevent, disrupt and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce of the State." *N.J.S.A.* 2C:41–1.1c. In order to prevent that evil, the Legislature saw the need "to provide that activity which is inimical to the general health, welfare and prosperity of the State and its inhabitants be made subject to strict civil and criminal sanctions." *Ibid.* Insofar as the activity of those who do not manage or supervise racketeering activity, but nevertheless knowingly assist it, is inimical to the interests identi-

fied, we see no reason why the Legislature would not seek to proscribe their conduct as well as that of their bosses.

We note also that the racketeering statute was enacted in one part of an omnibus crime bill, which additionally amended various other sections of the Criminal Code. *L.*1981, *c.* 167. One such amendment added a new paragraph to the general conspiracy statute. *L.*1981, *c.* 167, § 3. *N.J.S.A.* 2C:5–2g, entitled "Leader of Organized Crime," provides that "[a] person is a leader of organized crime if he purposefully conspires with others as an organizer, supervisor or manager, . . . ." Similarly, in the Comprehensive Drug Reform Act of 1986, *L.*1987, *c.* 106, the Legislature declared its intention to "target . . . the upper echelon members . . . of an organized drug distribution scheme," and defined "Leader of Narcotics Trafficking Network" thus: "[a] person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager. . . ." *N.J.S.A.* 2C:35–3. *See also State v. Afanador,* 134 *N.J.* 162, 172–73, 631 *A.*2d 946 (1993) (construing the word "organizer," in conjunction with the terms "supervisor, financier or manager" in *N.J.S.A.* 2C:35–3, to require the "exercise[ ] [of] some ability to dictate the conduct of others in a drug-trafficking scheme"). Because the Legislature has shown that it can craft a criminal statute to reach only those performing supervisory functions, we are confident that if it intended in RICO to cover only managers or supervisors, it would have done so expressly. *See Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969) (noting that Legislature is assumed to be thoroughly conversant with its own statutes).

Further support for the determination that the New Jersey statute does not require proof that a defendant's role is supervisory or managerial appears in the statute's liberal construction clause, *N.J.S.A.* 2C:41–6, which specifies those subsections of the RICO Act that "shall be liberally construed." Among the sections entitled to a liberal construction is *N.J.S.A.* 2C:41–2c, in which the "conduct or participate" language appears.

In the period since *Reves,* federal courts often seek to empha-size the breadth of the "operation or management" test. *E.g., Aetna Cas. Sur. Co. v. P & B Autobody,* 43 *F.*3d 1546, 1559–60 (1st Cir.1994) (rejecting argument that defendants engaged in defraud-ing insurance companies through false claims did not participate in operation or management of organization). Indeed, the Supreme Court itself explained in *Reves* that the standard would not limit liability only to upper management. Rather, an enterprise is operated also "by lower-rung participants ... who are under the direction of upper management" or "by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Reves, supra,* 507 *U.S.* at ——, 113 *S.Ct.* at 1173, 122 *L.Ed.*2d at 540 (footnote omitted).

For these several reasons, we conclude that the New Jersey statute does not contain a requirement that in order "to conduct or participate in an enterprise," a defendant must be found to exercise responsibilities of "operation or management." We hold that under *N.J.S.A.* 2C:41–2c, a person is "employed by or associated with an enterprise" if he or she has a position or a functional connection with the enterprise that enables him or her to engage or participate directly or indirectly in the affairs of the enterprise. Further, we hold that to conduct or participate in the affairs of an enterprise means to act purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist or help effectuate the goals of the enterprise. Those activities may include acts that are mana-gerial or supervisory or exercise control and direction over the goals, or over the methods used to achieve the goals, of the enterprise. Participatory conduct or activities also may be found in acts that are below the managerial or supervisory level, and do not exert control or direction over the affairs of the enterprise, as long as the actor, directly or indirectly, knowingly seeks to carry out, assist, or further the operations of the enterprise or otherwise seeks to implement or execute managerial or supervisory deci-sions.

## B.

The RICO conspiracy proscribed by *N.J.S.A.* 2C:41–2d consists of an agreement to violate the substantive provisions of the RICO Act. Hence, our understanding of the elements of a RICO conspiracy rests in large measure on the meaning of the substantive participation provision of the statute contained in subsection c.

As analyzed in *United States v. Neapolitan*, 791 *F*.2d 489, 494–500 (7th Cir.), *cert. denied*, 479 *U.S.* 939, 940, 107 *S.Ct.* 421, 422, 93 *L.Ed.*2d 371, 372 (1986), a RICO conspiracy has two separate elements: an agreement to violate RICO and the existence of an enterprise. The agreement to violate RICO itself has two aspects. One involves the agreement proper, that is, an agreement to conduct or participate in the conduct of the affairs of the enterprise. The other involves an agreement to the commission of at least two predicate acts. If either agreement is lacking, the defendant has not embraced the objective of the conspiracy—the substantive violation of the RICO Act—that is required for any conspiracy conviction under classic conspiracy law. *Id.* at 498–99. *See Koger v. State*, 513 *N.E.*2d 1250, 1255 (Ind.App.1987) (adopting the reasoning of *Neapolitan* notwithstanding absence of separate state RICO conspiracy provision); *State v. Porto*, 591 *A.*2d 791, 795 (R.I.1991) (same).

Courts, in analyzing the elements of a RICO conspiracy, generally concur that the level of awareness of a defendant need not be extensive. A defendant must have some minimal knowledge of the extent of enterprise, *United States v. Diecidue*, 603 *F.*2d 535, 556 (5th Cir.1979), *cert. denied*, 445 *U.S.* 946, 100 *S.Ct.* 1345, 63 *L.Ed.*2d 781 and 446 *U.S.* 912, 100 *S.Ct.* 1842, 64 *L.Ed.*2d 266 (1980), but need not know the identities of all the conspirators, nor need a defendant know all the details of the enterprise. *Riccobene, supra*, 709 *F.*2d at 225. It is sufficient if a defendant knows "the general nature of the enterprise and know[s] that the enterprise extends beyond his individual role." *United States v. Eufrasio*, 935 *F.*2d 553, 577 n. 29 (3d Cir.1991) (quoting *United States v.*

*Rastelli,* 870 *F.*2d 822, 828 (2nd Cir.), *cert. denied,* 493 *U.S.* 982, 110 *S.Ct.* 515, 107 *L.Ed.*2d 516 (1989)).

Greater controversy surrounds the question of the nature of the agreement required of a RICO conspirator. The debate focuses on whether a defendant must agree to commit *personally* at least two acts of racketeering or whether a defendant's agreement that others will commit the predicate acts is sufficient.

In *United States v. Elliott, supra,* 571 *F.*2d at 902, one of the earliest cases to discuss the elements of a RICO conspiracy, the court expressed the view that "Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales [for conspiracy] with a new statutory concept: the enterprise." Although ruling only that the government must prove an agreement to participate in the enterprise's affairs through a pattern of racketeering activity, the court in *United States v. Winter,* 663 *F.*2d 1120, 1136 (1st Cir.1981), *cert. denied,* 460 *U.S.* 1011, 103 *S.Ct.* 1249, 1250, 75 *L.Ed.*2d 479 (1983), relied on *Elliott* to hold that a RICO conspiracy required a defendant to agree to commit personally two or more predicate acts. Other courts follow *Elliott* and *Winter* in holding that to be convicted of a conspiracy to violate RICO, a defendant must agree to commit personally two acts of racketeering activity. *E.g., United States v. Ruggiero,* 726 *F.*2d 913, 921 (2d Cir.), *cert. denied,* 469 *U.S.* 831, 105 *S.Ct.* 118, 83 *L.Ed.*2d 60 (1984); *United States v. Sutherland,* 656 *F.*2d 1181, 1191–94 (5th Cir.1981), *cert. denied,* 455 *U.S.* 949, 102 *S.Ct.* 1451, 1617, 71 *L.Ed.*2d 663, 852 (1982); *Riccobene, supra,* 709 *F.*2d at 224–25.

However, many federal circuits find that a RICO conspiracy agreement exists when a defendant agrees to participate in the conduct of an enterprise's affairs with the knowledge and intent that someone associated with the enterprise will commit at least two predicate acts. *Banks, supra,* 918 *F.*2d at 421; *United States v. Pryba,* 900 *F.*2d 748, 760 (4th Cir.), *cert. denied,* 498 *U.S.* 924, 111 *S.Ct.* 305, 112 *L.Ed.*2d 258 (1990); *United States v. Neapoli-*

*tan, supra,* 791 *F.*2d at 494; *United States v. Joseph,* 781 *F.*2d 549, 554 (6th Cir.1986); *United States v. Adams,* 759 *F.*2d 1099, 1116 (3rd Cir.), *cert. denied,* 474 *U.S.* 906, 971, 106 *S.Ct.* 275, 336, 88 *L.Ed.*2d 236, 321 (1985); *United States v. Kragness,* 830 *F.*2d 842, 860 (8th Cir.1987); *United States v. Carter,* 721 *F.*2d 1514, 1531 (11th Cir.), *cert. denied,* 469 *U.S.* 819, 105 *S.Ct.* 89, 83 *L.Ed.*2d 36 (1984).

Our legislative history is silent as to the meaning of the conspiracy provisions of the RICO statute. The fairest implication of this silence is that the Legislature intended that general conspiracy law apply to prosecutions for conspiracy to violate RICO. *See Federal Insurance Co. v. Ayers,* 772 *F.Supp.* 1503, 1509 (E.D.Pa. 1991) (relying on *N.J.S.A.* 2C:5–2 to grant plaintiff's motion for summary judgment on RICO conspiracy liability), *reconsid. denied,* 1991 WL 274836 (E.D.Pa.1991). Our finding of that intent is in fact impelled by the RICO statute itself, *N.J.S.A.* 2C:41–2d, which incorporates the definition of "conspiracy" contained in the Code of Criminal Justice, *N.J.S.A.* 2C:5–2b.

■ Under traditional standards, the gravamen of the crime of conspiracy is the criminal agreement. *State v. Dennis,* 43 *N.J.* 418, 423, 204 *A.*2d 868 (1964). A conspiracy conviction does not turn on "doing the act, nor effecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement. . . ." *State v. Carbone,* 10 *N.J.* 329, 337, 91 *A.*2d 571 (1952). That traditional understanding is codified in the Criminal Code definition of conspiracy:

"[a] person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime * * *;

[*N.J.S.A.* 2C:5–2a.]

■ Moreover, to be guilty of conspiracy, the conspirators do not have to know each other, nor need they have personal knowledge of the outcome of the plan, *State v. Stefanelli,* 78 *N.J.* 418,

428–29, 396 *A*.2d 1105 (1979), and they do not have to join in the common purpose at the same time. *State v. Spruill,* 16 *N.J.* 73, 80–81, 106 *A*.2d 278 (1954). The Code reflects that understanding, providing that a person may be guilty of conspiring with others to commit a crime "whether or not he knows their identity." *N.J.S.A.* 2C:5–2b.

The federal understanding of the RICO conspiracy offense comports with our traditional treatment of conspiracy. Federal RICO was enacted against the backdrop of traditional conspiracy law. "Under classic conspiracy law, agreeing to the commission of the conspiracy's illegitimate objectives constitutes the crime." *Neapolitan, supra,* 791 *F*.2d at 496; *accord Carter, supra,* 721 *F*.2d at 1529; *Pryba, supra,* 900 *F*.2d at 760. A defendant may be guilty of a RICO conspiracy without committing a substantive RICO offense. In *Jones v. Meridian Towers Apartments, Inc.,* 816 *F.Supp.* 762, 772–73 (D.D.C.1993), the court determined that a conviction for a RICO conspiracy under subsection (d) requires that a defendant agree to violate RICO, regardless of whether he or she agreed to commit personally the predicate acts of subsection (c). That analysis, it reasoned, "applies equally to the conduct or participation requirement" of subsection (c) and, hence, to prove a conspiracy violation, the government need not show that the conspirator participated to the extent required by federal law under subsection (c), according to the *Reves* test. *See United States v. Quintanilla,* 2 *F*.3d 1469, 1484–85 (7th Cir.1993) (following *Jones* ); *Morin v. Trupin,* 832 *F.Supp.* 93, 99 (S.D.N.Y.1993) (same); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti,* 830 *F.Supp.* 257, 261 (E.D.Pa.1993) (same).

A fundamental tenet of RICO construction is that RICO creates new remedies but not new crimes, such that "a conspiracy to violate RICO should not require anything beyond that required for a conspiracy to violate any other federal crime." *Neapolitan, supra,* 791 *F*.2d at 497. When read together, subsections (c) and (d) under RICO "speak only to 'conspiring to conduct or participate, directly or indirectly, in the conduct of such enter-

prise's affairs through a pattern of racketeering activity, *i.e.,* two acts of racketeering activity within at least ten years of each other.'" *Carter, supra,* 721 *F.*2d at 1529. The phrase "through a pattern of racketeering activity" modifies the language preceding it, "the conduct of such enterprise's affairs," rather than the phrase "conspiring to conduct or participate." *Id.* at 1529 n. 22. Hence, requiring an agreement to commit personally the predicate acts in addition to agreement to the conspiratorial objective would establish a new form of conspiring with a degree of involvement that is not required of any other type of conspiracy. *Neapolitan, supra,* at 497–98; *Pryba, supra,* 900 *F.*2d at 760.

The Appellate Division here determined that there exists "no necessity that a RICO conspirator be involved in all aspects of the conspiracy, or have knowledge of all its participants." 268 *N.J.Super.* at 134, 632 *A.*2d 1222. A defendant's knowledge of the general nature of the enterprise and knowledge that the enterprise extends beyond his or her individual role is sufficient. *Ibid.* Moreover, "[f]or purposes of a RICO conspiracy, it is irrelevant whether each defendant participated in the enterprise's affairs through different and unrelated crimes, so long as the jury may reasonably infer that each crime was intended to further the enterprise's affairs." *Id.* at 110, 632 *A.*2d 1222. Accordingly, the Appellate Division held that in establishing a RICO conspiracy the State must show that a defendant

> agreed to participate directly or indirectly in the conduct of the affairs of the enterprise by agreeing to commit, or to aid other members of the conspiracy to commit, at least two racketeering acts * * *; and that he or she acted knowingly and purposely with knowledge of the unlawful objective of the conspiracy and with the intent to further its unlawful objective.
>
> [268 *N.J.Super.* at 99–100, 632 *A.*2d 1222.]

The Appellate Division further concluded a defendant need not agree to commit personally at least two predicate acts of racketeering. We concur. That conclusion is consistent with the Code definition of conspiracy, *N.J.S.A.* 2C:5–2a, which criminalizes an agreement that others will commit the substantive crime that is the objective of the conspiracy. Further, as pointed out by the

Appellate Division, requiring a defendant to agree to commit personally at least two predicate acts would " 'dilute the effectiveness of the RICO conspiracy remedy, and thwart [the legislative] objectives' " of the statute. 268 *N.J.Super.* at 123, 632 *A.*2d 1222 (quoting *Adams, supra,* 759 *F.*2d at 1116). Such a narrowing requirement could immunize a mob boss who neither agreed to commit personally nor actually participated in the commission of the predicate acts. *Ibid.* We are confident that the Legislature intended to confer no such immunity.

V

We turn, finally, to consider whether the trial court provided the jury with correct and adequate instructions on the several critical elements of the RICO substantive and conspiracy offenses and whether the evidence supported the jury's determinations of guilt.

The trial court, in instructing the jury on the elements of the substantive RICO offense, identified the following six elements of the crime:

(1) an Enterprise existed which was engaged in the unlawful disposal of solid waste within New Jersey; (2) the Enterprise engaged in or its activities affected trade or commerce; (3) the defendant was employed by or associated with the Enterprise; (4) the defendant engaged in a pattern of racketeering activity as will be defined later under the heading "Fourth Element." In order to establish such a pattern of racketeering activity the defendant must have committed at least two racketeering acts; (5) the defendant conducted or participated directly or indirectly in the conduct of the Enterprise's affairs through that pattern of racketeering activity; and (6) the defendant acted knowingly and purposely.

The Appellate Division enumerated five elements necessary to prove a violation under *N.J.S.A.* 2C:41-2c:

(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity.

[268 *N.J.Super.* at 99, 632 *A.*2d 1222.]

The trial court also gave particularized instructions on the critical terms: enterprise, pattern of racketeering activity, participation and conspiracy.

## A.

The trial court began its definition of "enterprise" by quoting most of the text of *N.J.S.A.* 2C:41-2c. The court then identified three sub-elements that the jury must find in order to find the existence of an "enterprise." These included: "(1) an organization, formal .or informal, which was ongoing; (2) in which the various associates functioned as a continuing unit; and (3) which existed separate and apart from the pattern of racketeering acts in which the various associates engaged." Further, in explaining the first sub-element, the trial court emphasized evidence "that the group had some structure for making decisions and some mechanism for controlling its own affairs on an ongoing basis." In explaining the second sub-element, the court emphasized evidence "that the associates performed roles which fit the structure of the group and furthered its aims and activities" and that "the group must have an existence beyond what is necessary merely to commit the racketeering acts." The trial court also charged the jury that it must find that the enterprise had an existence separate from that necessary merely to commit the racketeering acts. The court concluded its instruction on the enterprise element by informing the jury that it could convict only on a finding of a *single* enterprise.

We are satisfied that the convictions can be affirmed, while yet endorsing neither the very broad definition of "enterprise" applied by the Appellate Division, 268 *N.J.Super.* at 143, 632 *A.*2d 1222, nor the requirement of a structure beyond that necessary to commit the racketeering acts, as suggested by the trial court. That requirement of a structure imposed an additional factor to be proved by the State, and clearly its inclusion in the instruction did not prejudice defendants.

Defendants also argue that no jury can find the existence of an "enterprise" unless it finds the existence of a "common purpose," and concluded that because the trial court never so instructed the jury, the convictions cannot stand. Defendants

contend that they had no such purpose because each was interested chiefly in his own profit. The Appellate Division found that the trial court's charge adequately communicated the substance of the element of "common purpose." Moreover, the Appellate Division noted that this claim was raised as plain error, and that defendants have not shown prejudice. 268 *N.J.Super.* at 108–09, 111–14, 632 *A*.2d 1222.

In assessing the evidence, the Appellate Division characterized the defendants as forming

> a somewhat disorganized group of individuals. They had no real "leader" as that term is commonly understood; there was no one to whom all members owed allegiance, or to whom all members are required to report. In fact, the group's members did not even seem to like each other, and were often engaged in double-dealing and back-stabbing. However, they deliberately associated themselves with one another in order to make money from illegal dumping.
>
> [*Id.* at 107, 632 *A*.2d 1222.]

The adequacy of the evidence to support the jury's determination of the existence of an enterprise is also demonstrated indirectly by the trial court's disposition of defendants' motion for an acquittal based on the grounds that the State had not proven the existence of an "ascertainable structure." In evaluating the evidence and denying the motion, the trial court noted the common purpose of the associates, the continuing character of their efforts, and their functional division of labor. *See* 268 *N.J.Super.* at 105, 632 *A*.2d 1222.

. The evidence demonstrates that defendants were at the core of a large-scale dumping scheme involving many people. All were aware of the illegal objective of the enterprise, and they discussed their plans frequently. The dirt brokers solicited the dumpers, arranged for the provision of dump sites, and generally oversaw the entire operation. The public-official defendants functioned as protectors of the scheme and deliberately frustrated official investigations into the dumping. Various other persons, such as the lookouts and the individual haulers, performed distinct roles integral to the running of the enterprise. Defendants planned where the dumping would occur and determined when sites had to be

switched. The scheme required notice of when and where to dump each evening and the falsification of public records. The scheme thus entailed an enterprise that displayed an "organization" of its members as evidenced by the interaction of the participants, and the extensive planning, coordination and cooperation necessary to effectuate its objectives.

## B.

We consider next the correctness of the instruction and the sufficiency of the evidence with respect to the element of "pattern of racketeering activity."

The trial court began its instruction on this element by noting that it requires proof of at least two racketeering acts, and then instructed the jury on the elements of the various alleged predicate offenses themselves. With respect to the necessity of a "pattern," the court noted that proof of two racketeering acts is necessary but not sufficient. Its instruction contains within it strong suggestions of both relatedness and continuity requirements.

In addition to quoting the statute, *N.J.S.A.* 2C:41–2c, the court stated that

> in determining whether racketeering acts constitute a pattern, you should consider whether the acts are related to each other or to the affairs of the Enterprise. The acts may be considered related if, due to the organization, duration and objectives of the Enterprise, the acts posed a threat of a series of criminal violations over a significant period of time. Acts do not constitute a pattern if they reflect merely isolated or sporadic activity. Rather, taken together, the acts must be related in some way and must reflect continuous activity during the period in which they were committed.

With respect to the continuity aspect of the pattern, the court charged:

> Evidence of continuous activity could be shown by the existence of a threat of an ongoing series of criminal violations over a significant period of time. You should consider the number of acts committed, the length of time during which they were committed, the similarity of the acts, the number of victims and any distinguishing characteristics of the acts.

The court concluded its instruction on the pattern element by stating:

In summary, you may find that a defendant engaged in a pattern of racketeering activity if you find that the defendant committed at least two or more of the racketeering acts charged against that defendant; that the acts were related, not isolated events; and that the acts reflected ongoing activity.

With respect to the challenge to the jury instructions concerning "pattern of racketeering," the Appellate Division acknowledged that the trial court's instruction required a finding of both relatedness and continuity. 268 *N.J.Super.* at 131, 632 *A.*2d 1222. It found that the State had presented sufficient evidence for the jury to determine that defendants had agreed to commit and had committed predicate acts with the same or similar purpose and the same or similar participants to further the illegal dumping. *Id.* at 143, 632 *A.*2d 1222. "Here, 'relatedness' among the predicate acts can be inferred from the facts." *Ibid.*

We are satisfied that the State provided ample evidence to prove a pattern of racketeering activity committed by defendants. That evidence demonstrates a pattern of racketeering activity under the totality of the circumstances by establishing incidents that are both related and are neither isolated nor disconnected. Defendants engaged in repeated incidents of racketeering activity that involved the same participants throughout most of the enterprise, and the same methods of commission. Defendants had a system ensuring that the enterprise ran smoothly. Clearly, the repeated criminal acts were related by having the common purpose of furthering the goal of the enterprise, which was to make money from illegal dumping. Further, the State proved that the incidents of racketeering were not isolated or sporadic events in that the illegal acts were the enterprise's regular way of doing business and were ongoing in that they occurred over a period of time and posed a threat of continuation into the future.

## C.

We deal next with the instructions and the evidence concerning participation and conspiracy. We note that two defendants, Bassi

and Harvan, were convicted of violating subsection c, the conduct or participation substantive offense, while all defendants were convicted of conspiracy under subsection d.

In listing the six elements of the substantive RICO crime, the trial court identified two elements relevant to the issue of the participation of particular defendants. The trial court required the State to prove that "the defendant was employed by or associated with the Enterprise," and that "the defendant conducted or participated directly or indirectly in the conduct of the Enterprise's affairs through that pattern of racketeering activity." The court proceeded separately to define each of those elements.

With respect to the "employed by or associated with" element, the court, evidently drawing on the language by which the statute establishes the "conduct or participate" element, stated that:

This can be shown by the defendant knowingly participating directly or indirectly in the conduct of the affairs of the enterprise. The defendant need not have known the identity of all the other participants in the enterprise or the details of the commission of each of the racketeering acts committed by others, but the defendant must have been aware of the scope and unlawful activities of the enterprise.

With respect to the "conduct or participate" element itself, the court instructed the jury that

This element requires the State to prove beyond a reasonable doubt that a connection exists between the Enterprise on the one hand and the pattern of racketeering acts on the other hand. A connection is shown if: (1) the racketeering acts were related to the activity of the Enterprise or (2) the defendant was able to commit the racketeering acts solely because of his position in the Enterprise, or is involved in the control of the affairs of the Enterprise.

Although the trial court did not charge the jury literally in the terms of our formulation of the requirement of participation, its charge effectively covered each of the essential aspects of the standard we now adopt. The trial court's charge required that the participation be "knowing," and that defendants be "aware of the scope and unlawful activities of the enterprise." The charge also required that the "acts" of defendants be "related to the activity of the Enterprise" or be undertaken because of a defendant's position or control within the enterprise. That sufficiently embraces the standard that the participatory acts must

knowingly seek to further or assist the operation of the enterprise or to implement or effectuate managerial or supervisory decisions. As the Appellate Division pointed out, though most of the defendants were convicted of conspiracy under subsection d, "there was ample evidence to conclude such participation existed." 268 *N.J.Super.* at 132, 632 *A.*2d 1222. We fully concur.

Defendants were all key players in the illegal scheme, and without their participation and direction, the enterprise could not have been successful. In addition, defendants did actually commit acts of racketeering to further the conspiracy; thus, agreement to the commission of those acts is indisputable. The defendants in the action now before the Court represent only a part of the enterprise. They were, however, an important part. Joseph Mocco, otherwise known, according to the indictment, as "The Big Guy," "The King," and "God," was the Town Clerk of North Bergen. He was responsible for the issuing of all manner of permits, including permits to dump. The evidence strongly indicates that he was the supervisor of defendant Hurtuk, the license inspector, and also that Mocco held meetings in his office at which the principal participants appeared. Defendant Dulanie was the deputy chief of police, and appears to have exerted his influence to get charges dismissed against the dumpers, in return for a fee, and may also have participated in meetings at Mocco's office. Hurtuk, finally, was very active in the everyday management of the enterprise. Whenever the dumpers encountered trouble, they would summon him to the site and he would handle the problem. Also, he attempted to divert the investigation of the undercover DCJ officers away from the enterprise. Defendants Harvan and Bassi appear to have been responsible for finding dumping sites and for establishing a payment schedule with people who needed to dump. Finally, there is the now-deceased defendant Ball, who as a dumper also played an important role in the enterprise.

With respect to the conspiracy charge, the trial court first explained to the jury the meaning of the substantive RICO crime, and then instructed the jury on the crime of conspiring to commit

substantive RICO offense. It identified the following five elements of the crime:

(1) An Enterprise existed which was engaged in the unlawful disposal of solid waste within New Jersey;

(2) the Enterprise engaged in or that its activities affected trade or commerce;

(3) the defendant was employed by or associated with the Enterprise;

(4) the defendant agreed to participate directly or indirectly in the conduct of the affairs of the Enterprise by agreeing to commit or aid some other members of the conspiracy in the commission of at least two racketeering acts as charged in the Indictment;

(5) the defendant acted knowingly and purposely with knowledge of the unlawful objective of the conspiracy charged in the Indictment and with an intent to further that unlawful objective.

As for the first three elements, the trial court referred the jury to the instructions given with respect to the substantive RICO offense. On the fourth element, the court instructed the jury as follows:

In order for you to find a defendant guilty of the crime of conspiracy, the State need not prove the defendant actually committed the crime of racketeering; rather, the State must prove beyond a reasonable doubt that the defendant with the purpose of promoting and facilitating the commission of the crime of racketeering, agreed with at least one other person referred to in the Indictment that one of them would commit the crime or engage in conduct which would constitute the crime or an attempt to or a solicitation to commit the crime, or agreed to aid such other person or persons in the planning or commission of the crime.

The court further explained that the State need not prove the actual commission of racketeering, but only that the defendant "agreed to participate directly or indirectly in the conduct of the affairs of the racketeering enterprise and agreed to the commission of at least two racketeering acts." The court proceeded to give other general instructions on the elements of a conspiracy. Relevant to the issues raised on appeal was the instruction that:

To be a member of the conspiracy, a person need not know all the details of the conspiracy or know all its members, or the details of the commission of the racketeering acts by others, but the defendant must be aware of the scope and unlawful activities of the conspiracy.

We are satisfied that the trial court's instructions correctly conveyed to the jury the standards for determining a RICO conspiracy.

██ We agree with the Appellate Division, 268 *N.J.Super.* at 135, 632 *A.*2d 1222, that the evidence was more than sufficient to support the conspiracy convictions.

## VI

The judgments of conviction are affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.