

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-2006

# Cetel v. Kirwan Fin Grp Inc

Precedential or Non-Precedential: Precedential

Docket No. 04-3408

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Cetel v. Kirwan Fin Grp Inc" (2006). *2006 Decisions*. Paper 496.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/496

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 04-3408, 05-1329, 05-1503, 05-1504
_____

Case No. 04-3408

KAREN CETEL; MORTON SCHNEIDER;
MARVIN CETEL; MARVIN CETEL, M.D., P.A.;
BARBARA SCHNEIDER;
BARBARA SCHNEIDER, M.D., F.A.C.S., P.A.

v.

KIRWAN FINANCIAL GROUP, INC.; BARRY COHEN;
MICHAEL KIRWAN; NEIL PRUPIS; LAMPF, LIPKIND,
PRUPIS, PETIGROW & LaBUE;
RAYMOND G. ANKNER;
CJA ASSOCIATES; BEAVEN COMPANIES, INC.;
MEDICAL SOCIETY OF NEW JERSEY;
INTER-AMERICAN INSURANCE CO. OF ILLINOIS;
COMMONWEALTH LIFE INSURANCE CO.;
PEOPLES SECURITY LIFE INSURANCE CO.;
MONUMENTAL LIFE INSURANCE CO.;
CAPITAL HOLDING COMPANY;
AEGON INSURANCE GROUP;
INDIANAPOLIS LIFE INSURANCE CO.

(District of New Jersey Civil No. 00-cv-5799)

VIJAY SANKHLA, M.D., on behalf of himself and
others similarly situated

v.

COMMONWEALTH LIFE INSURANCE COMPANY;
PEOPLES SECURITY LIFE INSURANCE COMPANY;
PROVIDIAN LIFE INSURANCE COMPANY; AEGON
USA INC.; MONUMENTAL LIFE INSURANCE
COMPANY; INDIANAPOLIS LIFE INSURANCE CO.;
RAYMOND G. ANKNER; BEAVEN COMPANIES, INC.;
CJA AND ASSOCIATES; KIRWAN FINANCIAL GROUP,
INC.; KIRWAN FINANCIAL ADVISORY, INC.; BARRY
COHEN; MICHAEL KIRWAN; PACIFIC EXECUTIVE
SERVICES; STEPHEN R. ROSS; DONALD S. MURPHY;
SEA NINE ASSOCIATE ; DSM, INC.; NEW JERSEY
MEDICAL PROFESSION ASSOCIATION;
SOUTHERN CALIFORNIA  MEDICAL PROFESSION
ASSOCIATION; THE MEDICAL SOCIETY OF NEW
JERSEY; NEIL PRUPIS

District of New Jersey Civil No. 01-cv-04781)

Vijay Sankhla, M.D., *Yale Shulman, M.D.,
*Yale Shulman, M.D., P.A., *Boris Pearlman, M.D.
*Denville Radiology, P.A., Marvin Cetel, M.D.,
Karen Cetel, Marvin Cetel, M.D., P.A.,
Barbara Schneider, M.D., Morton Schneider,
Barbara Schneider, M.D. P.A.,
Appellants
*(Pursuant to Rule 12(a), F.R.A.P.)

2

_____

Case No: 05-1329

KAREN CETEL; MORTON SCHNEIDER;
MARVIN CETEL; MARVIN CETEL, M.D., P.A.;
BARBARA SCHNEIDER;
BARBARA SCHNEIDER, M.D., F.A.C.S., P.A.

v.

KIRWAN FINANCIAL GROUP, INC.; BARRY COHEN;
MICHAEL KIRWAN; NEIL PRUPIS; LAMPF, LIPKIND,
PRUPIS, PETIGROW & LaBUE; RAYMOND G. ANKNER;
CJA ASSOCIATES; BEAVEN COMPANIES, INC.;
MEDICAL SOCIETY OF NEW JERSEY;
INTER-AMERICAN INSURANCE CO. OF ILLINOIS;
COMMONWEALTH LIFE INSURANCE CO.;
PEOPLES SECURITY LIFE INSURANCE CO.;
MONUMENTAL LIFE INSURANCE CO.;
CAPITAL HOLDING COMPANY; AEGON INSURANCE
GROUP; INDIANAPOLIS LIFE INSURANCE CO.

(District of New Jersey Civil No. 00-cv-5799)

VIJAY SANKHLA, M.D., on behalf of himself and
others similarly situated

v.

COMMONWEALTH LIFE INSURANCE COMPANY;

3

PEOPLES SECURITY LIFE INSURANCE COMPANY;
PROVIDIAN LIFE INSURANCE COMPANY; AEGON
USA INC.; MONUMENTAL LIFE INSURANCE
COMPANY; INDIANAPOLIS LIFE INSURANCE CO.;
RAYMOND G. ANKNER; BEAVEN COMPANIES, INC.;
CJA AND ASSOCIATES; KIRWAN FINANCIAL GROUP,
INC.; KIRWAN FINANCIAL ADVISORY, INC.; BARRY
COHEN; MICHAEL KIRWAN; PACIFIC EXECUTIVE
SERVICES; STEPHEN R. ROSS; DONALD S. MURPHY;
SEA NINE ASSOCIATE ; DSM, INC.;
NEW JERSEY MEDICAL PROFESSION ASSOCIATION;
SOUTHERN CALIFORNIA  MEDICAL PROFESSION
ASSOCIATION; THE MEDICAL SOCIETY OF NEW
JERSEY; NEIL PRUPIS

(District of New Jersey Civil No. 01-cv-04781)


Marvin Cetel, M.D., Karen Cetel,
Marvin Cetel, M.D., P.A., Barbara Schneider, M.D.,
Morton Schneider, Barbara Schneider, M.D. P.A.,
Appellants

_____

Case No:  05-1503

KAREN CETEL; MORTON SCHNEIDER; MARVIN
CETEL; MARVIN CETEL, M.D., P.A.;
BARBARA SCHNEIDER;
BARBARA SCHNEIDER, M.D., F.A.C.S., P.A.

4

v.

KIRWAN FINANCIAL GROUP, INC.; BARRY COHEN;
MICHAEL KIRWAN; NEIL PRUPIS; LAMPF, LIPKIND,
PRUPIS, PETIGROW & LaBUE; RAYMOND G. ANKNER;
CJA ASSOCIATES; BEAVEN COMPANIES, INC.;
MEDICAL SOCIETY OF NEW JERSEY;
INTER-AMERICAN INSURANCE CO. OF ILLINOIS;
COMMONWEALTH LIFE INSURANCE CO.;
PEOPLES SECURITY LIFE INSURANCE CO.;
MONUMENTAL LIFE INSURANCE CO.;
CAPITAL HOLDING COMPANY; AEGON INSURANCE
GROUP; INDIANAPOLIS LIFE INSURANCE CO.

(District of New Jersey Civil No. 00-cv-5799)

VIJAY SANKHLA, M.D., on behalf of himself and
others similarly situated

v.

COMMONWEALTH LIFE INSURANCE COMPANY;
PEOPLES SECURITY LIFE INSURANCE COMPANY;
PROVIDIAN LIFE INSURANCE COMPANY; AEGON
USA INC.; MONUMENTAL LIFE INSURANCE
COMPANY; INDIANAPOLIS LIFE INSURANCE CO.;
RAYMOND G. ANKNER; BEAVEN COMPANIES, INC.;
CJA AND ASSOCIATES; KIRWAN FINANCIAL GROUP,
INC.; KIRWAN FINANCIAL ADVISORY, INC.; BARRY
COHEN; MICHAEL KIRWAN; PACIFIC EXECUTIVE
SERVICES; STEPHEN R. ROSS;

5

DONALD S. MURPHY; SEA NINE ASSOCIATE ; DSM, INC.; NEW JERSEY MEDICAL PROFESSION ASSOCIATION; SOUTHERN CALIFORNIA  MEDICAL PROFESSION ASSOCIATION; THE MEDICAL SOCIETY OF NEW JERSEY; NEIL PRUPIS

(District of New Jersey Civil No. 01-cv-04781)


Donald S. Murphy, Pacific Executive Services, DSM, Inc.,

Appellants

_____

Case No:  05-1504

KAREN CETEL; MORTON SCHNEIDER; MARVIN CETEL; MARVIN CETEL, M.D., P.A.; BARBARA SCHNEIDER; BARBARA SCHNEIDER, M.D., F.A.C.S., P.A.

v.

KIRWAN FINANCIAL GROUP, INC.; BARRY COHEN; MICHAEL KIRWAN; NEIL PRUPIS; LAMPF, LIPKIND, PRUPIS, PETIGROW & LaBUE; RAYMOND G. ANKNER; CJA ASSOCIATES; BEAVEN COMPANIES, INC.; MEDICAL SOCIETY OF NEW JERSEY; INTER-AMERICAN INSURANCE CO. OF ILLINOIS; COMMONWEALTH LIFE INSURANCE CO.; PEOPLES SECURITY LIFE INSURANCE CO.;

6

MONUMENTAL LIFE INSURANCE CO.;
CAPITAL HOLDING COMPANY; AEGON INSURANCE
GROUP; INDIANAPOLIS LIFE INSURANCE CO.

(District of New Jersey Civil No. 00-cv-5799)

VIJAY SANKHLA, M.D., on behalf of himself and
others similarly situated

v.

COMMONWEALTH LIFE INSURANCE COMPANY;
PEOPLES SECURITY LIFE INSURANCE COMPANY;
PROVIDIAN LIFE INSURANCE COMPANY; AEGON
USA INC.; MONUMENTAL LIFE INSURANCE
COMPANY; INDIANAPOLIS LIFE INSURANCE CO.;
RAYMOND G. ANKNER; BEAVEN COMPANIES, INC.;
CJA AND ASSOCIATES; KIRWAN FINANCIAL GROUP,
INC.; KIRWAN FINANCIAL ADVISORY, INC.; BARRY
COHEN; MICHAEL KIRWAN; PACIFIC EXECUTIVE
SERVICES; STEPHEN R. ROSS; DONALD S. MURPHY;
SEA NINE ASSOCIATE ; DSM, INC.; NEW JERSEY
MEDICAL PROFESSION ASSOCIATION;
SOUTHERN CALIFORNIA  MEDICAL PROFESSION
ASSOCIATION;
THE MEDICAL SOCIETY OF NEW JERSEY;
NEIL PRUPIS

(District of New Jersey Civil No. 01-cv-04781)

7

Monumental Life Insurance Company,
Commonwealth Life Insurance Company,
Capital Holding Corporation, and AEGON USA, Inc.,
Appellants

_____

On Appeal from the United States District Court
for the District of New Jersey

(D.C.  Nos. 00-cv-5799, 01-cv-4781)
District Judge:  The Honorable Anne E. Thompson

_____

ARGUED APRIL 24, 2006

BEFORE: SCIRICA, Chief Judge,
and NYGAARD,  Circuit Judge,
and YOHN,[*] District Judge.

(Filed August 28, 2006)

_____

_____

*Honorable William H. Yohn, Jr., Senior District Judge
for the United States District Court for  the Eastern District of
Pennsylvania, sitting by designation.

Mark J. Oberstaedt, Esq. (Argued)
Stephen J. Fram, Esq.
Archer & Greiner
One Centennial Square
P. O. Box 3000
Haddonfield, NJ 08033
        Counsel for Appellants/Cross Appellees


Kevin L. Smith, Esq. (Argued)
Hines Smith
3080 Bristol Street, Suite 540
Costa Mesa, CA 92626

Charles L. Becker, Esq.
Reed Smith
1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103-7301
        Counsel for Appellee/Cross Appellant
        Comm Life Ins. Co., et al.


Christopher P. Leise, Esq. (Argued)
White & Williams
457 Haddonfield Road
Suite 400 Liberty View
Cherry Hill, NJ 08034

Elizabeth A. Venditta, Esq.
Edward M. Koch, Esq.
White & Williams
One Liberty Place, Suite 1800
Philadelphia, PA 19103
        Counsel for Appellee/Cross Appellant Pacific
        Executive Serv., et al.

Walter F. Kawalec, III, Esq. (Argued)
Larry I. Zucker, Esq.
Marshall Dennehey Warner Coleman & Goggin
200 Lake Drive East
Woodland Falls Corporate Park, Suite 300
Cherry Hill, NJ 08002
        Counsel for Appellee/Cross Appellant
        Medical Society of NJ

Richard L. Hertzberg, Esq. (Argued)
Greenbaum Rowe Smith & Davis
P. O. Box 5600
Metro Corporate Campue One
Woodbridge, NJ 07095

Alain Leibman, Esq.
Stern & Kilcullen
75 Livingston Avenue
Roseland, NJ 07068
        Counsel for Appellee/Cross Appellant
        Raymond G. Ankner, et al.

10

William P. Marshall, Esq.
3101 Trewigton Road
P. O. Box 267
Colmar, PA 18915
          Counsel for Appellee Barry Cohen

Michael Kirwan
1249 Knox Drive
Yardley, PA 19067
          Pro Se

_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

Appellants/Plaintiffs are physicians and their professional corporations who purchased life insurance through Voluntary Employee Beneficiary Associations ("VEBAs") created, marketed, operated, and endorsed by Appellees/Defendants, a number of individuals, corporations, and associations connected

11

to the VEBAs.[1]  They claim that defendants misrepresented the potential tax benefits of the VEBAs to induce them to purchase the life insurance policies.  After the Internal Revenue Service decided that the VEBAs did not possess the tax benefits, plaintiffs brought civil RICO, ERISA, and state law causes of action against defendants.  The District Court granted defendants' motions for summary judgment.  We will affirm.

## I. FACTS

This case involves a protracted disagreement over the validity and legitimacy of VEBA plans that were developed and marketed in the early 1990s, the history of which can be read in *Neonatology Assocs., v. Comm'r*, 115 T.C. 43 (2000), *aff'd* 299 F.3d 221 (3d Cir. 2002).  Sometime in the mid-1980s, Donald Murphy and Stephen Ross formed a partnership called Pacific

---

[1]We refer herein to the parties simply as "plaintiffs" and "defendants."

Executive Services ("Murphy Defendants") and sought to sell life insurance policies through VEBAs specially designed to take advantage of the Tax Reform Act of 1986, Pub.L. 99-514, 100 Stat. 2085. The Murphy Defendants believed that the Tax Reform Act allowed them to market and sell life insurance policies through the tax-exempt VEBAs, creating a scheme by which they could sell more insurance policies by coupling them with the tax benefits of the VEBAs. Specifically, the Murphy Defendants conceived the scheme so as to require an employer to purchase, at an inflated cost, group life insurance for its employees. The annual contributions made by the employers (purportedly for their employees) were to be tax-deductible and the employees could later convert the group life insurance to individual policies such that any premium overpayments would convert to tax conversion credits. Under the Murphy Defendants' plan, purchasers could realize two distinct tax

13

benefits: (1) the professional corporations would be able to deduct the life insurance premium payments; and (2) after converting the group policies to individual policies, the individual employees would obtain the insurance overpayments as conversion credits.

To facilitate this plan, the Murphy Defendants engaged Michael Kirwan and Kirwan Financial Group as well as Barry Cohen ("Kirwan Defendants"), to act as "financial advisors," and to assist in the sales and marketing of the VEBAs to small professional businesses. As noted earlier, the money-making hook for the VEBAs was selling more life insurance policies. As such, the Murphy and Kirwan Defendants initially sold Continuous Group ("C-Group") life insurance policies[2] created

---

[2] C-Group life insurance policies "masquerade as a policy that provides only term life insurance benefits in order to make the product marketable to targeted investors." *See Neonatology*, 115 T.C. at 53. However, the policy is actually a universal life

(continued...)

14

by Raymond Ankner and supplied by his non-party company Inter-American Insurance Company. However, Inter-American lost financial stability and, in 1991, Ankner convinced a number of insurance sales companies ("Monumental Defendants")[3] to supply the C-Group policies. Consequently, the Monumental Defendants entered into a series of sales and marketing agreements with the Murphy and Kirwan Defendants. Additionally, in connection with the Murphy and Kirwan Defendants' attempts at marketing and promotion, the VEBAs were also endorsed by the Medical Society of New Jersey, a

[2.](...continued)
policy comprised of two distinct but related policies. The first — the accumulation phase — is a group term policy known as the C-group term policy. The second — the payout phase — is an individual universal policy known as the "C-group conversion universalife" policy. *Id.*

[3.]The Monumental Defendants include Commonwealth Life Insurance Company, Monumental Life Insurance, People Security Life, Capital Holding Company, Providence Life Insurance, and AEGON USA, Inc.

professional organization composed of physicians, in exchange for royalties generated by the sale of the VEBA plans to its members.

With this framework in place, defendants began marketing these plans to small businesses. Because they promised significant tax avoidance, the plans were appealing, and several businesses and employers purchased the VEBA plans from defendants. One such company was Lakewood Radiology, P.C., and its partners, plaintiffs Vijay Sankhla, Yale Shulman, and Boris Pearlman (collectively, the "Sankhla physicians"). After Cohen and Kirwan recommended that Lakewood participate in the VEBA scheme, the professional corporation agreed. Another corporation to be convinced by Cohen and Kirwan was that of Cetel and Schenider ("Cetel physicians"), who agreed to participate both individually and through their professional corporation. Both of these

16

corporations, and the doctors, individually, began making contributions to the VEBA plan in or around 1990. Moreover, all of the plaintiffs had dealings, in some capacity with Kirwan and Cohen, who became plaintiffs' financial advisors, in all relevant respects, for questions concerning the VEBA plans. Additionally, plaintiffs also came to know Neil Prupis, who was hired as an attorney by the Murphy Defendants.

However, the VEBA plans came to the attention of the IRS which, on June 5, 1995, issued Notice 95-34. Notice 95-34 stated that the IRS did not consider the VEBAs' tax-avoidance mechanism to comply with the tax code. It asserted that such deductions would be disallowed and that, if litigation were to ensue, it would assert this position in court. Moreover, in 1994 and 1995 the IRS issued deficiency notices to a number of the participants and also began audits of some businesses and individuals who had participated in the VEBA plans. After the

17

IRS issued Notice 95-34, and after the IRS issued its audit notices, Prupis was hired by the Murphy Defendants. He drafted a letter to Cohen on July 12, 1995, which Cohen circulated to the VEBA participants. This letter accompanied a memorandum from Cohen and Kirwan to the VEBA participants. Both communications sought to allay any concerns the participants might have developed in light of the IRS actions. To wit, the letters strongly conveyed the belief that the IRS had taken an incorrect position, that the VEBA plans were completely legitimate, and that no court had ever upheld the IRS' position concerning the validity of the VEBA plans. Nonetheless, the IRS began sending deficiency notices to the participants. Then, at the advice of Cohen and Kirwan, some of the participants retained Prupis as their attorney to help them deal with the IRS. Cohen and Prupis stood by their earlier assurances and a letter dated August 7, 1996, to the participants,

18

encouraging them to continue participating in the plan. It also outlined a proposal for attacking the IRS' position in Tax Court.

As it turned out, in 2000 the Tax Court did indeed determine that the VEBA plans marketed and sold by defendants impermissibly circumvented the intent and provisions of the Internal Revenue Code. *See Neonatology*, 115 T.C. at 43. Specifically, the court found that the VEBAs were merely "vehicles which were designed and serve in operation to distribute surplus cash surreptitiously (in the form of excess contributions) from the corporations for the employee/owner's ultimate use and benefit." *Id.* at 89. The Court also held that the individuals who had contributed to the plans were liable for any accuracy-related negligence penalties under I.R.C. § 6662(a). This decision all but invalidated plaintiffs' VEBA plans, and plaintiffs' professional medical corporations were denied deductions they had taken for the contributions to the plan; as

19

well, the individual participants were levied a significant tax on their dividend income.

The District Court found that the New Jersey Consumer Fraud Act did not cover plaintiff's allegations and also dismissed certain ERISA claims for lack of standing. The District Court granted summary judgment for all claims on statute of limitations grounds. Because the District Court's order and our review hinge on a thorough grasp of the predicate facts concerning plaintiffs' knowledge at all relevant times, we will review these facts as they relate to each individual plaintiff.

**Dr. Sankhla**

Vijay Sankhla practices radiology with Lakewood Radiology, P.A. Upon becoming a partner with the Lakewood group in 1995, Sankhla began participating in and made contributions to the VEBA plan. He continued making payments to the plan for five years, until 2000. He was never

audited by the IRS and claims he never saw their Notice 95-34. However, his employer was audited for its contributions to the VEBA plan, and he was subpoenaed in March 1995 in connection with this audit. Additionally, Sankhla admitted that he learned of the audits in mid-1995 and that he discussed the audits with his radiology partners. Consequently, he contacted Barry Cohen, the Lakewood Radiologists' VEBA plan financial advisor, and inquired about how the audits would affect him. Cohen assured him that "his previous VEBA contributions were entirely safe" but expressed a certain discomfort with one of the VEBA plans. He additionally told Sankhla that "we are going to win the [*Neonatology*] case," apparently in an effort to assure Sankhla of the safety of his investments. Moreover, he advised Sankhla that the only way to guarantee the safety of his previous VEBA plan investments would be to continue to make contributions to it for another three years, to enable him to make

21

tax-free withdrawals. By 2000, however, Sankhla could not get an adequate answer from Cohen concerning the propriety of continued participation in the VEBA plan and so decided to discontinue contributions to the plan.

**Dr. Pearlman**

Boris Pearlman, also a partner with Lakewood Radiology. He participated in and made contributions to the VEBA plan from 1991 until 1999. Like Sankhla, he terminated his participation in 2000. Pearlman also contends that he never saw the IRS Notice 95-34, although he did receive the July 1995 letter from Cohen and Kirwan. He also received a copy of the letter from Prupis. In addition, Pearlman received notice of an audit in June or July of 1995 and an IRS examination report. However, Pearlman contends that he did not receive a deficiency notice from the IRS until sometime after September 16, 1996.

22

After he received the IRS audit notice, Pearlman contacted Cohen and Prupis with his concerns. In response Cohen and Prupis both assured Pearlman that the "IRS had no case" and that the VEBA plans were legitimate and would continue to be so. Pearlman was apparently convinced by these avowals and continued to invest in the VEBA plan. After the Tax Court effectively invalidated the VEBA scheme in 2000, Pearlman quit contributing to the plan.

**Dr. Shulman**

A third partner at Lakewood Radiology, Yale Shulman participated in the VEBA plan from 1993 until 1998. Shulman was on the board of the Medical Society of New Jersey at the time that the Medical Society approved Cohen and Kirwan's VEBA plan scheme. He also received a copy of Cohen and Kirwan's 1995 letter, and Prupis' legal opinion concerning the VEBA plan. Cohen and Kirwan then advised Shulman that he

should retain attorney Prupis to represent him in connection with any impending IRS action. Shulman did so.

In late 1996, Shulman was audited by the IRS, which, in 1997, assessed penalties and taxes against Shulman for his contributions to the VEBA plan. Evidently still believing the plan to be legitimate, Shulman continued making contributions until 1998.

**Drs. Cetel and Schneider**

Marvin Cetel and Barbara Schneider are the last two physicians to participate in this particular VEBA scheme. They began participating and contributing to the VEBA plan in 1990 and both received the IRS Notice 95-34 in May of 1995, the IRS audit notices in June of 1995, and the Prupis and Cohen letter of July 12, 1995. Schneider also received a notice of deficiency from the IRS on October 31, 1995, after which she hired Prupis as her attorney. Both physicians also received the

24

letter from Prupis dated August 7, 1996. Schneider made her last contribution in 1998 and Cetel made his last contribution in 1997.

## II. PROCEDURAL HISTORY

This appeal comprises actions that were initially filed as two separate putative class actions (the Cetel action, filed on July 20, 2000 and the Sankhla action, filed on September 6, 2001).[4] Recognizing the importance of the *Neonatology* action for the future of their investments in the VEBA plan, both the Cetel physicians and the Sankhla physicians sought, and were granted, leave to participate as *amici curiae* in the *Neonatology* appeal to the Court of Appeals for the Third Circuit. *Neonatology Assocs. v. Comm'r.*, 293 F.3d 128 (3d Cir. 2002). After the Tax Court's decision was affirmed, 299 F.3d 221 (3d Cir. 2002), plaintiffs sued defendants, alleging violations of

---

[4] Pearlman and Shulman joined the Sankhla suit in March 2002.

25

ERISA, RICO, and various state law claims, including the New Jersey RICO statute and the New Jersey Consumer Fraud Act. Although the actions were initially filed separately in New Jersey state court, both were removed to the United States District Court for the District of New Jersey on the basis of the ERISA claims.

On July 8, 2002, the District Court dismissed the Sankhla physicians' state law claims as being preempted by section 514(a) of ERISA, 29 U.S .C. § 1144(a), and on November 25, 2002, consolidated the two cases.[5] After completion of discovery, defendants filed a motion for summary judgment, seeking to dismiss plaintiffs' remaining ERISA claims and their civil RICO claims.

[5.]Both suits named the same set of defendants: Barry Cohen, Michael Kirwan and Kirwan Financial Group, the Medical Society of New Jersey, Raymond Ankner and his companies, Commonwealth Life Insurance Company and related entities, and Neil Prupis, Esquire.

The District Court, in an order dated March 2, 2004, first reversed itself on the issue of ERISA preemption, reinstating plaintiffs' state law claims but declining to finally resolve them, and then granted defendants' motion for summary judgment on plaintiffs' federal RICO claims and most of the ERISA claims. The District Court held the RICO claims time-barred. Applying the four-year statute of limitations period established by the Supreme Court in *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156, 107 S. Ct. 2759, 97 L. Ed.2d 121 (1987) along with the "injury discovery rule" adopted by our Court in *Mathews v. Kidder Peabody & Co.,* 260 F.3d 239, 252 (3d Cir. 2001), the District Court determined that plaintiffs should have been on notice of their injuries, at the latest, in 1995 after the IRS issued Notice 95-34 and began its audits of the VEBA plan participants. With respect to plaintiffs' ERISA claims, the District Court held that the counts relating to §§ 409

27

and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2), should be dismissed for lack of standing because plaintiffs sought to recover benefits owed to them in their individual capacities and not on behalf of their employer plans. The District Court also dismissed both parties' attempts to import the findings of *Neonatology* to bind each other, employing its broad discretion to determine that collateral estoppel should be denied based on the complexity of the case. Finally, the District Court granted summary judgment to defendants on plaintiffs' "benefit-of-the-bargain" theory of recovery. The District Court opined that such damages would be highly speculative and would result in the enforcement of an illegal tax-avoidance scheme.

In a third opinion dated July 16, 2004, the District Court granted defendants' motion for summary judgment on all of the reinstated state law claims and the remaining ERISA and New Jersey RICO claims and denied plaintiffs' motion for

28

reconsideration of its March 2, 2004 opinion.[6] The District

Court held the surviving ERISA claims under section 502(a)(3)

of ERISA, 29 U.S.C. § 1132(a)(3), for breach of fiduciary duty

to be time-barred. The Court concluded that plaintiffs had

actual knowledge of their fiduciary-breach allegations when, in

1995, the IRS sent out Notice 95-34 and began its audits of the

VEBA plan participants. The District Court, noting that the

federal RICO statute served as a model for the state corollary

and in the absence of any governing state law to the contrary,

concluded that a four-year statute of limitations, analogous to

that in the federal Act, controlled the New Jersey RICO claims.

It held that this statute of limitations began running by the

summer of 1995, when all of the plaintiffs had learned of the

IRS Notice 95-34 or had learned that the IRS had audited or was

---

[6.]The District Court's dismissal of plaintiffs' breach of contract
and unjust enrichment claims are not appealed.

29

going to audit the personal accounts of the participants. Moreover, the District Court held that plaintiffs failed to undertake reasonable inquiries into the alleged fraud, vitiating their reliance on New Jersey's discovery rule as support for their claim that the statute of limitations should be equitably tolled. The District Court also rejected plaintiffs' claim that the statute of limitations did not begin to run until they suffered actual damages, concluding that under New Jersey law, fraud claims like those premised on the New Jersey RICO statute did not require a knowledge of actual damages.[7]  Finally, the District

---

[7.]The District Court applied the same reasoning to the Sankhla Plaintiffs' state law fraud-based claims, including fraud (Count XII), breach of fiduciary duty (Count XIV), breach of good faith and fair dealing (Count XVI), respondeat superior (Count XVII), conspiracy and aiding and abetting fraudulent misrepresentation (Count XVIII) and the physicians' negligent misrepresentation claim (Count XIII).  The District Court held that these claims had a six-year statue of limitations but, because the Sankhla physicians filed their claims in September 2001 and the date of accrual was, at the latest August 1995, these were

(continued...)

Court dismissed plaintiffs' Consumer Fraud Act claim, opining that, as a matter of law, the terms and scope of the CFA could not apply to the sale and purchase of the VEBA plans because, absent a clear indication by New Jersey courts otherwise, the CFA did not intend to cover the sale and purchase of the complex tax-avoidance schemes at issue here.

The disposition of this third opinion did leave certain common law state claims intact, but plaintiffs entered into a settlement agreement concerning these claims shortly thereafter and the District Court entered a final Order of Dismissal. Plaintiffs timely appeal from this Order and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review decisions granting summary judgment de novo, applying the same legal standard as the trial court to the same record. *Omnipoint Comm'cns*

---

[7.](...continued)
also time barred.

31

*Enters., L.P. v. Newtown Twp.*, 219 F.3d 240, 242 (3d Cir. 2000). Summary judgment can only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

### III. Discussion

### A.

We will quickly dispose of a preliminary waiver issue. Plaintiffs argue that when certain defendants filed their answers to the complaint they failed to raise the issue of the statute of limitations, instead taking the position that the claims asserted were not ripe because the Tax Court litigation had yet to conclude. In essence, plaintiffs make a waiver argument. The District Court rejected it, applying the statute of limitations to

32

bar all pertinent claims against all defendants. We review the District Court's decision for abuse of discretion and we will affirm on this point. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir.), *cert. den.* 532 U.S. 921 (2000). It is true that "parties should generally assert affirmative defenses early in litigation, so they may be ruled upon, prejudice may be avoided, and judicial resources may be conserved." *Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002). However, there is no hard and fast rule limiting defendants' ability to plead the statute of limitations. Accordingly, affirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice. *Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir. 1991). Here, the District Court determined, and we agree, that plaintiffs suffered no undue prejudice because they had notice that the statute of limitations was an issue for the simple reason that other defendants had pleaded in their answer that the claims

33

were time-barred.  Because plaintiffs were on sufficient notice, it did not inhibit their ability to gauge and respond to all the possible defenses.  The District Court was well within the bounds of its discretion to allow defendants to plead the statute of limitations even if they had not done so in their initial answers.

## B. Federal RICO Claims

Turning to the substance of plaintiffs' appeal, the first issue we address is whether the District Court erred when it dismissed plaintiffs' federal RICO claims as time-barred. Plaintiffs do not contest that civil RICO actions are subject to a four-year statute of limitations.  *See Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000).  Rather, they recognize that the dispositive question concerning the federal RICO claims here is whether plaintiffs were on "inquiry notice" of their injuries by August 1995.  In determining when a RICO claim accrues, we

34

apply an injury discovery rule "whereby a RICO claim accrues when plaintiffs knew or should have known of their injury." *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001) (quoting *Forbes*, 228 F.3d at 484). As we noted in *Mathews*, this rule has "both subjective and objective" components and, with respect to the subjective, "a claim accrues no later than when the plaintiffs themselves discover their injuries." *Id.* However, because the components are disjunctive we first perform an objective inquiry to determine when plaintiffs should have known of the basis of their claims, which "depends on whether [and when] they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006) (internal quotations omitted). Moreover, plaintiffs have inquiry notice

35

"whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of due diligence, to discovery of his or her injury." *Mathews*, 260 F.3d at 252.

In determining inquiry notice, our analysis proceeds in two steps. First, the burden is on the defendant to show the existence of "storm warnings." *Id*. Storm warnings have not been exhaustively catalogued, but they are essentially any information or accumulation of data "that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Id*. This is an objective inquiry and hinges not on a plaintiff's actual awareness of suspicious circumstances or even on the ability of a plaintiff to understand their import. Instead, "[i]t is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm

36

warning." *Id*. This charge saddles the investor with responsibilities like reading prospectuses, reports, and other information related to the investments, *Mathews*, 260 F.3d at 252, and, additionally, assumes knowledge of "publicly available news articles and analyst's reports." *Benak*, 435 F.3d at 400 quoting *Lui v. Credit Suise First Boston Corp. (In re Initial Public Offering Sec. Litig.)*, 341 F. Supp.2d 328, 345 (S.D.N.Y. 2004)). Once determined, the second step then shifts the burden to plaintiffs to show that, heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm. *Mathews*, 260 F.3d at 252; *Benak*, 435 F.3d at 400.

Here, we conclude that the District Court correctly decided that sufficient storm warnings existed by August 1995 to satisfy the first prong of our inquiry notice analysis. By August 1995, the IRS had circulated Notice 95-34, which

informed plaintiffs that the IRS had not approved the deduction contributions to VEBA plans and, in fact, had actually disallowed these deductions. The Notice made clear that the VEBA plans were inconsistent with the tax code. Additionally, in 1995 the Medical Society stopped endorsing the VEBA plans and the IRS undertook audits of some of the plaintiffs, amassing even more troubling storm clouds. All this information, taken together, establishes with enough objective certainty that storm warnings did exist concerning the lawfulness of the VEBA plans, thus satisfying the first step.[8]

---

[8] We decline to treat Sankhla differently from any of the other plaintiffs in determining that sufficient storm warnings were sounding by August 1995. The fact that Sankhla may have never seen the IRS' Notice or heard of the audits does not save him from attribution of inquiry notice because, as noted earlier, his employer was audited and he was subpoenaed in connection to this audit in March 1995. Moreover, he admitted that he had learned of the audits of his other Lakewood Radiology partners by mid-1995 and that he had discussed the audits and their implications with his partners. Thus, the existence of storm

(continued...)

38

With respect to the second step, there is little doubt that plaintiffs exercised scant, if any, diligence in attempting to discover their injuries. The District Court appropriately commented that:

> [i]t seems incredible . . . to argue they relied solely on the defendants' assurances of a "victory" over the IRS in the Tax Court . . . . Asking the defendants whether the plans were legal does not constitute reasonable due diligence . . . . [A] reasonable person would not continue to participate in a tax avoidance scheme after the IRS issues a notice condemning such plans, and that person was the subject of an IRS audit of his participation in that plan.

By all accounts, plaintiffs' only effort to discover their injuries was to inquire about the validity of the plans with Cohen and Prupis, both defendants in this dispute and also, at the time, involved in the running and operation of the plan. Both Cohen

---

[8.](...continued)
warnings by August 1995 applies to all plaintiffs, including Sankhla.

and Prupis continued to assure plaintiffs that the plans were legitimate and "would be upheld in the courts." In *Mathews*, we addressed a similar degree of diligence and concluded that it did not constitute the exercise of due diligence expected of reasonable investors. There, plaintiffs sent a letter to defendants inquiring into the state of their investment. Defendants responded that they "remain[ed] confident in the underlying value of the . . . assets and believe[d] this value will be realized once the[] markets turnaround." *Mathews*, 260 F.3d at 255. Plaintiffs in *Mathews* argued that this inquiry constituted reasonable diligence, but we rejected that argument, stating:

> Reasonable due diligence does not require a plaintiff to exhaust all possible avenues of inquiry. Nor does it require the plaintiff to actually discover his injury. At the very least, however, due diligence does require plaintiffs to do something more than send a single letter to the defendant.

*Id*. at 255.

40

This analysis guides our conclusion here. Merely asking defendants whether the plans were legal is inadequate to show reasonable diligence. As we noted in *Mathews* and reiterate here, plaintiffs who undertake no diligence beyond superficial inquiry of defendants concerning the validity or propriety of their investments cannot obtain the benefit that a finding of reasonable diligence will confer. Accordingly, plaintiffs have not met their portion of the burden-shifting requirement under our inquiry-notice analysis and thus cannot defeat the finding that they were on inquiry notice by August 1995 and, by extension, that their claims accrued as of that date. *See id.*; *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002).

Plaintiffs submit, however, that even if their claims accrued by August 1995, the District Court should have tolled the statute of limitations because defendants fraudulently concealed the VEBA scheme and therefore prevented plaintiffs

41

from discovering their injuries. It is true that "[f]raudulent concealment is an equitable doctrine that is read into every federal statute of limitations[,]" *Mathews*, 260 F.3d at 256 (quoting *Davis v Grusemeyer*, 996 F.2d 617, 624 (3d Cir. 1993), and additionally, that it will toll the RICO limitation period "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it." *Id.* (quoting *Rotella v. Wood*, 528 U.S. 549, 561, (2000). But, to benefit from the equitable tolling doctrine, plaintiffs have the burden of proving three necessary elements: (1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts. *Mathews*, 260 F.3d at 256.

Plaintiffs' claim fails on the third element. As discussed above, plaintiffs did not exercise the due diligence expected of a reasonable investor because they failed to undertake any investigation into the meaning of the storm warnings beyond asking defendants whether their plans were legitimate. As in *Mathews*, a finding that plaintiffs did not exercise reasonable diligence for the determination of when the claim accrues will also likely foreclose the possibility of equitable tolling. *Id.* at 257 ("In order to avoid summary judgment, there must be a genuine issue of material fact as to whether the Appellants exercised reasonable due diligence in investigating their claim).[9]

[9]We, of course, do not suggest that in every case involving an IRS audit of some form, the claim will begin to run on the date of the audit. Nor do we suggest that assurances made by an investment's promoter or manager will never toll the statute of limitations. Rather, these types of questions are necessarily fact specific, based on the presence and exact type of storm warnings and the extent of inquiry undertaken with respect to due diligence. In this case, plaintiffs simply did not exercise enough
(continued...)

43

Finally, with respect to the federal RICO claims, plaintiffs contend that under basic contract law, the accrual date could only occur when a default in the contractual obligation occurs. The District Court properly rejected this claim, holding that "plaintiffs have failed to proffer sufficient evidence that defendants breached any contractual obligation" and that "plaintiffs have not pointed to any contractual provision or duty that obligated Defendants to provide tax benefits." Unlike in the creditor-debtor context, where an injury may not accrue unless and until the debtor defaults on some contractual obligation, *see Cruden v. Bank of New York*, 957 F.2d 961, 967 (2d Cir. 1992), there simply is no contractual obligation upon which one of the parties could have defaulted. In short, there is

[9.](...continued)
diligence to either prevent the claim from accruing or to allow the statute of limitations to be tolled, as both "benefits" hinge on the exercise of reasonable diligence.

44

no contractual claim, and plaintiffs' attempt to reframe their RICO claims in this vein appropriately must fail.

## C. New Jersey RICO Claims

Plaintiffs next object to the District Court's application of a four-year statute of limitations to their New Jersey RICO claims as opposed to a six-year limitations period. Although they concede that some New Jersey courts have applied the federal RICO statute of limitations of four years to New Jersey RICO claims, *see Matter of Integrity Ins. Co.*, 584 A.2d 286 (1990), they insist that due to some recent changes to the way New Jersey courts approach state RICO claims, "it can no longer be predicted that the New Jersey Supreme Court would feel compelled to follow federal law in determining the appropriate statute of limitations for NJRICO." Thus, they argue that the law is unsettled with respect to how long the statute of limitations is for New Jersey RICO claims and suggest

45

that the appropriate statute of limitations should be six years.[10]

To support this claim, plaintiffs rely on *State v. Ball*, 661 A.2d 251 (N.J. 1995), in which, according to plaintiffs, the New Jersey Supreme Court declined to interpret NJRICO coextensively with federal interpretations of RICO, instead opting to interpret NJRICO as governed by state law principles. We disagree. A close reading of *Ball* suggests, contrary to plaintiffs' contention, that the New Jersey Supreme Court believed the New Jersey RICO statute was and should be consistent with the federal RICO statute. *Ball*, 661 A.2d at 258 ("[B]ecause the federal statute served as an initial model for [the NJRICO statute], we heed federal legislative history and case law in construing our statute."). Moreover, subsequent New Jersey cases belie plaintiffs' contention that the New Jersey

---

[10.] This is the general statute of limitations for New Jersey state law claims. *Mirra v. Holland Am. Line*, 751 A.2d 138, 140 (N.J. App. Div. 2002)

46

RICO is somehow divergent from the federal RICO statute. *See, e.g., Interchange State Bank v. Veglia*, 668 A.2d 465, 472 (App. Div. 1995) ("There is no state decisional law on this aspect of civil RICO law. Therefore, parallel federal case law is an appropriate reference source to interpret the RICO statute."). In any event, nothing in *Ball*, or any other case, stands for the proposition that claims under the New Jersey RICO statute possess a six-year statute of limitations, as opposed to the commonly applied four-year limitations period for federal RICO claims. There is no evidence that the New Jersey RICO statute possesses a different statute of limitations from the federal RICO statute and we refuse to adopt such a rule. Thus, for the reasons above, and because plaintiffs were

47

on notice of their claims, we will affirm the dismissal of the

NJRICO claim on the ground of statute of limitations.[11]

## D. ERISA Claims

---

[11.]Our decision that the District Court was correct in applying the four-year statute of limitations to plaintiffs' New Jersey RICO claims is buttressed by the Supreme Court's analysis in *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987), which held that a universal four-year statute of limitations would apply in federal civil RICO actions. After deciding that a uniform federal statute of limitations was necessary, the Court adopted the Clayton Act's statute of limitation. The Court found that the Clayton Act provided the closest analogy to federal civil RICO claims because both statutes "were designed to remedy economic injury by providing for the recovery of treble damages, costs and attorney's fees. Both statutes also bring to bear the pressure of 'private attorneys' general' on a serious national problem for which public prosecutorial resources are deemed inadequate." 483 U.S. at 151. We anticipate the New Jersey Supreme Court will apply this analysis to New Jersey law and adopt the New Jersey Antitrust Act as the closest analogy to the New Jersey Racketeering Act, thus, the Antitrust Act's four-year statute of limitations would apply. *See Integrity Insurance*, 584 A.2d at 287.

48

We turn next to plaintiffs' claim that the District Court erred when it dismissed the ERISA §§ 409 and 502(a)(2) claims for lack of standing. The District Court granted summary judgment for defendants on these two counts because it found that plaintiffs had only sought to recover damages in their individual capacities and failed to name their employer plans as plaintiffs. Because plaintiffs had not sued in a representative capacity they could not meet the standing requirements under either sections 409 or 502(a)(2). Plaintiffs present two arguments on appeal. However, we need not address them because irrespective of the vitality of their arguments, their ERISA §§ 409 and 502(a)(2) claims and their ERISA § 502(a)(3) claim are barred by the statute of limitations. *See Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 133 (3d Cir. 2006) (citing *Bernitsky v. United States*, 620 F.2d 948, 950 (3d Cir. 1980)) (recognizing that "we can affirm on

49

any basis appearing in the record"). ERISA § 413, 29 U.S.C. § 1113 provides that all claims based on breach of fiduciary duty must be brought within the earlier of:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

By its terms then, ERISA's statute of limitations provision offers a choice of periods, depending on "whether the plaintiff has actual knowledge of the breach . . . ." *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996). In *Gluck v. Unisys Corp.*, we established that:

> Actual knowledge of a breach or violation requires that a plaintiff have actual knowledge of

50

> all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transactions's harmful consequences, or even actual harm.

960 F.2d 1168, 1178 (3d Cir. 1992) (internal citations omitted).

We have thus stated that for purposes of determining actual knowledge, it must be shown that "plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation." *Montrose Med. Group Participating Savs. Plan v. Bulger*, 243 F.3d 773, 787 (3d Cir. 2001) (citations omitted). In other words, where a claim is for breach of fiduciary duty, to be charged with actual knowledge "requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated." *Gluck*, 960 F.2d at 1178.

51

Recognizing that the § 1113 statute of limitations sets a "high standard for barring claims against fiduciaries prior to the expiration of the six-year limitations" and the requirements must be interpreted "stringently," *Montrose*, 243 F.3d at 778, here, we nonetheless agree with the District Court that by 1995, plaintiffs had actual knowledge of the events and facts necessary to understand that a claim or violation existed. The core of plaintiffs' breach of fiduciary duty claim is that defendants made or ratified material misrepresentations to plaintiffs, or concealed material information from them, concerning the legitimacy of the VEBA plans. The record reveals the presence of IRS audits, examination reports, deficiency notices, Notice 95-34, and the possibility that plaintiffs would have to pay taxes, penalties, and interest on money they were told would be tax-free, in addition to their concerns that this information engendered. The totality of this information unequivocally demonstrates that plaintiffs

52

were not only aware of all the material necessary to determine that defendants had in fact misrepresented the tax benefits of the VEBA plans, but also that defendants' representations were suspect.[12]

Plaintiffs' claim that their knowledge of a possible breach could not have arisen until the Tax Court invalidated the VEBA plans in 2001 is unpersuasive in light of both the clear import of the IRS's statements and warnings that the plans were in violation of the tax code and that any deductions stemming from investments in the VEBA plans would be disallowed, and the IRS' actions in disallowing, at that time, the contributions made to the VEBA plans. This information and corresponding official

[12.]We decline to treat Sankhla differently here again because, as noted earlier, despite the fact that he was never audited and never received a deficiency notice, he was subpoenaed in connection with his employer's audit in March 1995, and learned of and discussed the audits and their implications with his partners who had been targeted by the IRS, thereby placing him in possession of the same knowledge as the other plaintiffs.

action stand in direct contradiction to the representations made by defendants and support a conclusion that, as a matter of law, plaintiffs were aware of the facts establishing a breach of fiduciary duty and thus in possession of actual knowledge necessary to understand that some claim exists. *See Romero v. Allstate Corp.*, 404 F.3d 212, 226 (3d Cir. 2005) ("In order to make out a breach of fiduciary duty claim . . . , a plaintiff must establish each of the following elements (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.") (quoting *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir. 2001)); *see also Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 202–03 (3d Cir. 2006).

54

Moreover, the record establishes that after the IRS circulated Notice 95-34 and after it had audited and disallowed certain of plaintiffs' contributions, certain plaintiffs sought legal advice concerning the validity of the VEBA plans and the propriety of defendants' claims concerning the plan's validity. This establishes sufficient evidence that they were aware of the alleged breach and belying any claim to the contrary that they could not have known or understood that some claim existed.[13] *See Connell v. Trustess of the Pension Fund of the Ironworkers Dist. Council*, 118 F.3d 154, 158 (3d Cir. 1997) (recognizing that evidence of actual knowledge of an alleged breach can include the fact that plaintiffs sought expert advice). Consequently, we conclude that the evidence establishes that

---

[13] Of course, as noted earlier, the legal advice they sought came from defendants' own attorney, Prupis, but this is irrelevant for a determination of whether plaintiffs had actual knowledge of the alleged breach.

55

plaintiffs were in possession of the "material facts necessary to understand that some claim exists," *Gluck*, 960 F.2d at 1177, and, therefore, that they had actual knowledge of the alleged breach and are subject to the three year statute of limitations period for the ERISA claims. Accordingly, we will affirm the District Court's order dismissing plaintiffs' ERISA claims.

## E. Plaintiffs' State Law Claims

Plaintiffs also object to the District Court's dismissal of their myriad state common law claims as time-barred.[14] Both parties agree that these claims are governed by New Jersey state law, which applies a six-year statute of limitations. N.J.S.A. § 2A:14-1; *Mirra v. Holland America Line*, 751 A.2d 138, 142

---

[14.]As noted earlier, plaintiffs state law fraud claims include fraud (Count XII), breach of fiduciary duty (Count XIV), breach of good faith and fair dealing (Count XVI), respondeat superior (Count XVII), conspiracy and aiding and abetting fraudulent misrepresentation (Count XVIII) and negligent misrepresentation (Count XIII).

(N.J. App. Div. 2002); The District Court determined that plaintiffs' state law claims accrued in August 1995, when the IRS issued Notice 95-34 and some plaintiffs were audited. In making this determination, the District Court was bound to apply New Jersey's discovery rule, which begins the statute of limitations running when two conditions are met: (1) the plaintiff has suffered actual injury; (2) the plaintiff knows that the injury is due to the fault of another.[15] *Martinez v. Cooper*

---

[15.]Generally, a cause of action accrues when a plaintiff has suffered an injury and is aware of a causal relationship between the injury and the actor. *See S. Cross Overseas Agency, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999). However, where "a party is reasonably unaware either that he has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity," the discovery rule will "postpone the accrual of a cause of action" until such time as a "reasonable person, exercising ordinary diligence, [would know or should have known] that he or she was injured due to the fault of another." *Caravaggio v. D'Agostini*, 765 A.2d 182, 186–87 (N.J. 2001). Here, it is agreed that because the plaintiffs' common law state claims sound in fraud, the discovery rule is applicable. *S. Cross*, 181 F.3d at 425 ("When

(continued...)

*Hosp./Univ. Med. Ctr.*, 747 A.2d 266, 272 (2000). This inquiry boils down to "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another," and requires an objective analysis. *Caravaggio v. D'Agostini*, 765 A.2d 182, 186–87 (N.J. 2001).

As we have discussed earlier, despite plaintiffs' assertions to the contrary, by August 1995 a reasonable person, exercising ordinary diligence, would have known both that they had been injured and that the injury was due to the fault of defendants. The presence of Notice 95-34 and its attendant consequences, combined with the audits and deficiency notices constitute sufficient harm to satisfy the first prong of the

[15.](...continued)
the gist of the action is fraud concealed from the plaintiff, the statute begins to run on discovery of the wrong or of facts that reasonably should lead the plaintiff to inquire into the fraud.").

58

discovery test. *See Nappe v. Anscheleqitz, Barr, Ansell & Bonell*, 477 A.2d 1224 (N.J. 1984). And, additionally, despite the clear signs that plaintiffs had been harmed, they failed to make reasonable inquiries or investigations into the source of that harm, thus vitiating any claim that they could not establish some causation between their harm and another's fault. *See Apgard v. Lederle Labs.*, 588 A.2d 380, 383 (N.J. 1991); *see also Savage v. Old Bridge-Sayreville Med. Group, P.A.*, 633 A.2d 514 (N.J. 1993). We thus have no trouble agreeing with the District Court that, by August 1995, for purposes of plaintiffs' state law claims, the statute of limitations had begun to run.[16]

[16.]Additionally, plaintiffs' insistence that the continuing tort doctrine renders the District Court's conclusion erroneous fails because, although the doctrine might apply where the plaintiff has no reason to believe he has been injured, it will not apply where the plaintiff "discovered or should have discovered the injury and its cause connection with the [negligence] before that
(continued...)

59

**F. New Jersey Consumer Fraud Act**

Plaintiffs next contend that the District Court erred by holding that the New Jersey Consumer Fraud Act (CFA) does not apply. Specifically, the District Court held that because the VEBA plans "were extremely complicated tax avoidance schemes involving tens, if not hundreds, of thousands of dollars[,]" to apply the Consumer Fraud Act would "stretch the admittedly broad application of the [] Act beyond the intent of the New Jersey legislature." Plaintiffs argue that the CFA must

---

[16.](...continued)
time." *Lopez v. Sawyer*, 279 A.2d 116, 123 (N. J. App.Div. 1971). Here, plaintiffs should have discovered the cause of their injury in August 1995 because this is when facts became available that a reasonable person would have taken to suggest the possibility of wrongdoing. Additionally, neither the continuing tort doctrine nor the "last overt act" doctrine, which defendants also press, applies to fraud claims. No New Jersey courts have ever applied these doctrines to fraud claims and we are unwilling, on these facts, to do so today. *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp 1438 (D.N.J. 1991).

be applied broadly, and to the VEBA plans at issue here, as commanded by the New Jersey Supreme Court's holding in *Lemelledo v. Beneficial Management Corp.*, 696 A.2d 546, 550–51 (N.J. 1997).  We are unpersuaded.

The CFA "is intended to protect consumers by eliminating sharp practices and dealings in the marketing of merchandise and real estate."  *Id.* at 554 (internal quotations omitted); *see* N.J. Stat. Ann. § 56:8-1 *et seq.*[17]  It is true that in *Lemelledo*, the New Jersey Supreme Court held the Act to apply

---

[17.]By its terms, the Act prohibits:
> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been mislead, deceived or damaged thereby . . . .

N.J. Stat. Ann. § 56:8-2.

61

to the sale of insurance policies to consumers. 696 A.2d at 555 ("[O]ur reading of the CFA convinces us that the statute's language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers."). However, as New Jersey courts have repeatedly made clear, the CFA seeks to protect consumers who purchase "goods or services generally sold to the public at large." *Marascio v. Campanella*, 689 A.2d 859 (App.Div. 1997). Furthermore, "[t]he entire thrust of the Act is pointed to products and services sold to consumers in the popular sense." *Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 637 (N.J. Super. Ct. App. Div. 2000) (internal quotations omitted). Thus, the CFA "is not intended to cover every transaction that occurs in the marketplace[,]" but, rather, "[i]ts applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." *Id*.

These facts are insufficient to establish that the plans at issue, and the transactions by which they were sold, qualify as "products and services sold to consumers in the popular sense[,]" such that they fall within the ambit of the CFA. *Arc Networks*, 756 A.2d at 638. As opposed to the traditional sale of insurance policies, which are undoubtedly subject to the provisions of the CFA, *see Lemelledo*, 696 A.2d at 551, the VEBA plans at issue here are instead rather complex arrangements that do not reflect the kinds of "goods or services generally sold to the public." *Arc Networks*, 756 A.2d at 638.

As the District Court found, the VEBA plans were complex tax-avoidance schemes designed primarily to allow an investor to make tax-deductible contributions while allowing for a permanent tax deferral upon withdrawal. Moreover, the plans were not available to the general public and were never marketed as such. Thus, the plans represent a highly specific

63

scheme providing no real insurance products to plaintiffs, necessarily marketed to a discrete and specific class of capable investors — not the general public. Unlike the sale of credit to the general public or the "sale of insurance policies . . . that are marketed to consumers[,]" or even "anything offered[] directly or indirectly to the public for sale," *Lemelledo*, 696 A.2d at 551, the sale of complex employee welfare benefit plans to a very specific class of investor does not point to the remedial purpose or intent of the CFA, "namely, to root out consumer fraud." *Id*. Consequently, because "the entire thrust of the [CFA] is pointed to products and services sold to consumers in the popular sense[,]" *id*., we cannot conclude that the District Court erred when it dismissed plaintiffs' claim under the CFA.[18]

---

[18.]Two issues remain. Penultimately, plaintiffs claim the District Court's erred by denying their claim to recover "benefit-of-the-bargain" damages for losses incurred as a result of the collapse of the VEBA plans. Because we affirm the District Court's

(continued...)

## IV. Conclusion

For the foregoing reasons, we will affirm the District Court's orders granting defendants' motions for summary judgment.

---

[18.](...continued)
dismissal of plaintiffs' substantive claims in all respects, including the dismissal of plaintiffs' state law claims, the issue as to whether plaintiffs could proceed under a benefit-of-the-bargain theory of recovery is moot. Lastly, on cross-appeal, defendants argue that plaintiffs' state law claims are preempted by ERISA. Because we have dismissed the state claims on other grounds, we need not reach and do not address this issue. *Nugent v. Ashcroft*, 367 F.3d 62, 168 (3d Cir. 2004).